# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**TEMUJIN KENSU, individually and on behalf of all others similarly situated,**

*Plaintiffs,*                                              **Case No.: 2:19-cv-10944**

v.                                                                    **Hon. Mark A. Goldsmith**

**CORIZON, INC., QUALITY CORRECTIONAL CARE OF MICHIGAN, P.C.;**

*Defendants.*
_____/

EXCOLO LAW, PLLC
Keith L. Altman (P81702)
Solomon M. Radner (P73653)
Albert J. Asciutto (P82822)
Attorneys for Plaintiff
26700 Lahser Road, Suite 401
Southfield, MI 48033
(866) 9392656
kaltman@excololaw.com
sradner@excololaw.com
aasciutto@excololaw.com
_____/

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOW COMES Plaintiff Temujin Kensu, on behalf of himself and all other

similarly situated, by and through their attorneys, EXCOLO LAW, PLLC, and

complain and allege on personal knowledge as to Plaintiffs' own acts and on

information and belief as to all other allegations against CORIZON, INC.

("CORIZON") and QUALITY CORRECTIONAL CARE OF MICHIGAN, P.C.

("QCC") as follows:

## **INTRODUCTION**

1.  This class action arises from the fraudulent and deceptive policy, practice, or custom implemented by Defendants Corizon and QCC, whereby Corizon and QCC, responsible for administering medical care for prisoners housed in the Michigan Department of Corrections, instituted an abhorrent scheme designed to unreasonably deny prisoners access to necessary medical treatment for their serious medical needs in violation of the Eighth Amendment of the United States Constitution.

2.  The Class is defined as:

> Individuals who are or were prisoners incarcerated in facilities of the Michigan Department of Corrections, and beginning in 2014, through Defendant Corizon's contract with the MDOC to provide healthcare services to prisoners, were denied access to medically necessary treatment or services in deliberate indifference to the prisoner's serious medical needs.

3.  Defendants conspired to institute a policy, practice, or procedure designed to deprive Plaintiff and the Class from access to necessary medical care, engaging in misconduct for the purpose of maximizing profits by neglecting or refusing to address the serious medical needs of the patients Defendants contracted to treat.

4.     Although Corizon or QCC never officially "denies a treatment," they "defer" a request or recommendation for treatment.  However, this policy, practice, or custom to "defer" treatment has the exact same effect on a patient as a denial.   Whether "deferred" or denied, the patient never receives the treatment.

5.     Through Defendants' fraudulent policy, practice, or custom, when presented with a referral from a physician dictating a course of treatment necessary for a prisoner patient's standard medical care, Defendants followed a policy, practice, or custom where the standard protocol was to "defer" 90% to 99% of all physician-recommended requests crucial for a prisoner's medical treatment.

6.     Additionally, Defendants operated according to a policy, practice, or custom to unreasonably deny all overnight surgeries, without a medical basis.

7.     While MDOC Policy Directive dictates that the Chief Medical Officer ("CMO") will make the final approval for surgeries and that surgery will be authorized if "the primary purpose is to restore function," in January of 2015, it was uncovered that Defendants operated according to a policy, practice, or custom that "No surgery other than o/p [outpatient] surgery without overnight stay will ever be approved."

8.     In August of 2016, the policy changed, where prisoners were allowed to

have an overnight stay in the local hospital for surgery.

9.  This change in policy shows that prior to August of 2016, prisoners were unreasonably denied medical treatment for their serious medical needs without a medical basis. They were simply denied necessary medical treatment according to a policy, practice, or custom promulgated by Defendants that forbid approving surgery that required an overnight stay.

10. Further, Defendants routinely neglected to follow proper procedure when denying these requests.

11. MDOC Policy Directives outline that the decision to approve a surgery is to be made by the CMO.

12. Ignoring this policy directive, at the expense of the prisoner's health, Corizon officials who are not the CMO routinely deny surgery requests.

13. Prisoners are routinely denied access to specialists based upon the judgment of non-specialists.

14. Even when a specialist recommends a course of treatment, these recommendations are often ignored.

15. Furthermore, Defendants operate according to a policy, plan, or custom intentionally designed to insulate themselves and their subordinates from liability.  This policy, plan, or custom is designed so that the structuring of Defendants' fraudulent enterprise ensures that no one is responsible for their

frequent misconduct, misdeeds, and deliberate indifference to serious medical needs.

16. Defendants have engaged in a long history of misconduct and deliberate indifference to Plaintiff and Class's serious medical needs.

17. This long history of misconduct and deliberate indifference to the serious medical needs of prisoners is not just confined to Plaintiff and the Class. Defendants have a long history of misconduct and deliberate indifference evidenced across numerous judgments and settlements.

18. In *Hadix v. Caruso*, 461 F. Supp. 2d 574 (W.D. Mich. 2006), in a scathing opinion delivered by the Honorable Richard Alan Enslen, Judge Enslen condemned Defendants' policies, practices, and customs, demanding justice for Defendants' widespread and unreasonable conduct:

> You are valuable providers of life-saving services and medicines. You are not coatracks who collect government paychecks while your work is taken to the sexton for burial. If a patient does not receive necessary medical or psychological services, including medicines and specialty care, it is not his problem, it is your problem, a problem that must be solved at lunch, nights or weekends, if necessary. If someone in the bureaucracy, including CMS, is stopping you from providing necessary services in a timely way, or stopping the patient from obtaining necessary specialist care or medicine, you should pester the malefactors until they respond and the services are provided. If they still won't relent, you are to relay their names, including correct spellings and addresses at which they may be arrested, to the medical monitor so those persons may be held in contempt and jailed, if necessary. The days of dead wood in the Department of Corrections are over, as are the days of CMS intentionally delaying referrals and care for craven profit motives.

*Hadix v. Caruso*, 461 F. Supp. 2d 574, 598-99 (W.D. Mich. 2006)

19.     Despite the standard of care requiring Defendants to treat Plaintiff and the Class's serious medical needs, the treatments required by Plaintiff and Class, and recommended by their physicians and specialists, are denied by the Defendants without any medical justification.

20.     Despite a record and medical history replete with laboratory tests and physician recommendations supporting and documenting these serious medical needs, Defendants engaged and continues to engage in a policy, practice, or custom to deprive Plaintiff and the Class of treatment for their serious medical needs.

21.     This policy, practice, or custom instituted to deny Plaintiff and the Class treatment for their serious medical needs is not for any medical purpose. This policy, practice, or custom is done by Defendants in order to save money.

22.     Despite Plaintiff and the Class's continued pleas, grievances, and filed lawsuits requesting that Defendants provide adequate medical care to treat their serious medical needs, Defendants engaged and continues to engage in deliberate indifference to Plaintiff and the Class's serious medical needs, as they refuse to administer necessary medical care.

23.     Despite this extensive list of wrongful and harmful conduct by the

Defendants, Plaintiff and the Class have continued to seek medical care from the Defendants only because they are forced to do so, as there is no other available option for treatment.

24.     Defendants operated according to this policy, practice, or custom in deliberate indifference to prisoners' serious medical needs without a medical basis.  Defendants did this in order to save money.

25.     Plaintiff and the Class state that due to Defendants' widespread and intentionally abusive practices, methods, and policies pertaining to their medical care, Plaintiff and the Class were unreasonably denied access necessary medical treatment.

26.     When medical care is denied to prisoners, Defendants' benefit.  First, they are paid a fixed amount per prisoner, per month.  Defendants are responsible for the costs of the care.  See Exhibit A, p. 53.  The less they spend on care, the more profit Corizon earns.   There is also a portion of the contract which rewards Defendants for lowering costs as they receive a bonus of 15% of the cost savings.  See Exhibit A, p. 53.  Thus, there is a financial incentive to deny necessary care to prisoners.

27.     Defendants' past and ongoing conduct has resulted in violations of Plaintiff and Class's civil rights as secured by 42 U.S.C. § 1983 and the Eighth Amendment of the United States Constitution.

28.     Accordingly, Plaintiff and the Class have been extensively damaged, as stated in this Complaint.

## DESCRIPTION OF THE PLAINTIFF CLASS

29.     This class action is brought by Plaintiff Temujin Kensu, individually and on behalf of a Class of similarly situated individuals, who are residents and/or citizens of Michigan, and since 2014, have relied upon Corizon and QCC for all of their medical treatment as prisoners housed in the Michigan Department of Corrections ("MDOC").

30.     Through its unlawful policies, practices, or customs, Defendants conspired to deprive individuals of, or will deprive individuals of, their constitutionally guaranteed access to necessary medical treatment through one or more of the following methods:

    A. Representing the character, nature, and quality of the medical care provided to Plaintiff and the Class to be of the "highest quality" designed to "improve the health and safety" of patients housed in the MDOC;

    B. Failing to meet even the most basic standard of care owed to Plaintiff and the Class regarding necessary medical treatment for their serious medical needs;

    C. Instituting a policy, practice, or custom whereby Defendants would

"defer," without a medical basis, 90% to 99% of all physician-recommended referrals for a course of treatment, procedure, or test necessary for a prisoner's medical treatment;

D.  Instituting a policy, practice, or custom whereby Defendants would deny, without a medical basis, prisoners' surgeries that required an overnight stay; and

E.  Unreasonably denied prisoners necessary medical treatment for their serious medical needs without a medical basis.

## PARTIES

### A. PLAINTIFFS

31.   Plaintiff TEMUJIN KENSU (hereinafter "Kensu" or "Plaintiff") was entitled to necessary medical treatment from Defendant Corizon, Inc. At all times relevant to this action, Plaintiff has been and is currently incarcerated in facilities of the Michigan Department of Corrections. Plaintiff is a citizen of Michigan.

32.   Kensu was confined at Saginaw Correctional Facility, located at 9625 Pierce Rd., Freeland, MI 48623 during the initial events giving rise to this action.

33.   Kensu has been confined at various facilities within the Michigan Department of Corrections for the entire duration of events that give rise to this action.

34.     Kensu is currently confined at Macomb Correctional Facility (MRF), located at 34625 26 Mile Road, Lenox Township, MI 48048.

35.     As used herein, Plaintiff and the Class will be collectively referred to as "Plaintiffs."

### B. DEFENDANTS

36.     Defendant Corizon, Inc. is a Delaware corporation with a principal place of business located at 103 Powell Ct., Brentwood, TN 37027. Corizon may be served at its registered agent, The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, MI, 48170. Corizon is responsible for providing medical care to the prisoners throughout the state. When a prisoner has a medical issue, it is Corizon who will deliver health care services to the prisoner.

37.     Defendant Quality Correctional Care of Michigan, P.C. is a Michigan Corporation with a principal place of business located at 6452 Millennium Drive, Suite 100, Lansing, MI, 48917.  QCC may be served at its registered agent, The Corporation Company, 40600 Ann Arbor Road East, Suite 201, Plymouth, MI, 48170. QCC is in a contractual relationship with Defendant Corizon to administer medical care to prisoners.  The exact nature of the contractual relationship between Corizon and QCC is unknown. QCC is responsible for providing medical care to the prisoners throughout the state.

When a prisoner has a medical issue, it is QCC who will deliver health care services to the prisoner.

38.   Defendants derive substantial income from doing business in Michigan.

39.   Upon information and belief, Corizon contracted with the Michigan Department of Corrections to provide medical care to prisoners housed in MDOC facilities throughout the State of Michigan.[1]

40.   When the violations alleged in this complaint occurred, Defendants were not acting in furtherance of a legitimate governmental function and thus is not entitled to governmental immunity.

## JURISDICTION AND VENUE

41.   This Honorable Court is conferred jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331 *et. seq*.

42.   Corizon is a Delaware corporation and has its principal place of business in Tennessee. QCC is a Michigan Corporation and has its principal place of business in Michigan.

43.   At all times relevant to this action, Defendants engaged in substantial business activities in Michigan, including, but not limited to, contracting with the Michigan Department of Corrections to provide medical care to thousands of prisoners in Michigan.

---

[1] Attached to this Complaint as Exhibit A is a copy of Corizon's current contract with the State of Michigan.

44. At all times relevant to this action, Corizon contracted within the state of Michigan for the purpose of, and did in fact, engage in the business of providing medical care and services within Michigan with the reasonable expectation that the medical care and services would be used and relied upon in this state, and thus regularly solicited or transacted business in this state.

45. Plaintiff and all members of the Class are domiciliaries of the State of Michigan, are expected to number in the thousands.

46. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and because Plaintiffs are residents of this judicial district, Defendants conduct business within this judicial district, and a substantial part of the events and omissions giving rise to the claims and alleged harms occurred herein.

47. Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award declaratory and injunctive against the Defendants for the violations of Plaintiff and the Class's constitutional rights and harm caused by their actions/inactions.

## COMPLIANCE WITH PRE-EXHAUSTION REQUIREMENTS

48. Plaintiffs adopt be reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

49. Plaintiff has complied with all respects of the Pre-Exhaustion Requirements of the Prison Litigation Reform Act through the appropriate grievance

processes of the MDOC for the grievances upon which this litigation is based.

50.     Plaintiff has filed hundreds of grievances addressing the issues raised in this matter. Plaintiff has exhausted all administrative remedies.

## COMMON FACTUAL ALLEGATIONS

51.     Plaintiffs adopt be reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

52.     Plaintiff and the Class have long, documented histories of many serious medical needs that affect their daily lives.

53.     This history of serious medical needs is documented through years of Plaintiff and the Class's requests for adequate treatment from Defendants.

54.     Despite Plaintiff and the Class's continued pleas, grievances, and lawsuits requesting that Defendants provide adequate medical care to treat their serious medical needs, Defendants engaged and continues to engage in deliberate indifference to Plaintiffs' serious medical needs in refusing to administer necessary medical care.

55.     Defendants have taken affirmative steps to ensure that Plaintiff and the Class will not receive necessary medical care for their serious medical needs.

56.     Defendants' conduct is a clear violation of the Eighth Amendment of the Constitution, as Defendants routinely demonstrates deliberate indifference to Plaintiff and the Class's serious medical needs.

## A. DEFENDANT CORIZON, INC.

57.   Defendant Corizon, Inc. is a Delaware corporation engaged in the for-profit business of providing healthcare to correctional facilities across the country, operational in more than 500 prisons and jails across the nation.

58.   Corizon advertises themselves as a "correctional healthcare pioneer" who provides "high-quality healthcare and reentry services that will improve the health and safety of … patients, reduce recidivism and better the communities where we live and work."[2]

59.   Billing themselves as the "biggest and the best" experts in the industry, Corizon claims a "commitment to success through evidence-based medicine" that makes them "the ideal partner for your correctional healthcare needs."[3]

60.   Corizon further advertises a "breadth and depth of knowledge that only a company like Corizon Health can provide" when "awarding a large prison or statewide prison system's health contract, whether for the first time or through the rebid process." Corizon promotes its service to "more prison inmates than any other private entity, which gives our team the confidence, expertise, and experience to answer your questions and develop a program

---

[2] www.corizonhealth.com
[3] http://www.corizonhealth.com/index.php/S=0/About-Corizon/Who-We-Are-History-and-Today

suited to your unique needs."[4]

## B. DEFENDANT CORIZON, INC. CONTRACTS WITH THE MICHIGAN DEPARTMENT OF CORRECTIONS TO PROVIDE HEALTHCARE SERVICES IN ALL MDOC FACILITIES

61.    Since 1998, the Michigan Department of Corrections ("MDOC") has contracted with Corizon to provide healthcare services to prisoners housed in MDOC facilities.

62.    In 2016, Corizon and the MDOC contracted to expand the services Corizon provided to MDOC prisoners to include mental health and pharmacy.

63.    As Corizon boasts, "this decision, awarded through a competitive bid process that included two other bidders, reflects the tremendous work the Corizon Health clinical team does on a daily basis within Michigan prisons and demonstrates that a commitment to excellent patient care creates strong client partnerships."[5]

64.    Corizon currently holds a five year, $715,700,000 contract to provide healthcare services to prisoners housed in the MDOC.[6]

65.    In Michigan, all Corizon healthcare professionals servicing prisoners in the MDOC are employees of the Defendant QCC.  Upon information and belief,

---

[4] http://www.corizonhealth.com/About-Corizon/serving-prisons
[5] http://www.corizonhealth.com/index.php/S=0/Corizon-News/corizon-health-wins-michigan
[6] https://www.freep.com/story/news/local/michigan/2017/09/15/nurses-suspended-state-police-investigating-jackson-prisoners-sudden-death-cotton-john-stein/666914001/

QCC is a wholly owned subsidiary of Defendant Corizon.  In Michigan, all medical care delivered to prisoners is jointly delivered by Defendant Corizon and Defendant QCC.  Thus, for all allegations against Defendant Corizon for Michigan based conduct, those allegations are similarly alleged against Defendant QCC.

## C. DEFENDANT CORIZON, INC. HAS A POLICY, PRACTICE, OR CUSTOM OF DELIBERATE INDIFFERENCE TO THE TREATMENT OF PRISONERS

66.   At the outset of Defendants' contract with the MDOC to provide medical care, Defendant engaged in a deceptive and fraudulent policy, practice, or custom of denying Plaintiff and the Class access to treatment for their serious medical needs.

67.   On March 28, 2018, this widespread Corizon policy was evidenced in deposition testimony in the case of *Temujin Kensu v William Borgerding, M.D.,* et al, 4:16-cv-13505, by former Corizon employee Physician Assistant ("P.A.") Marianne McKissick.

68.   P.A. McKissick, the primary treater at MRF for Kensu's serious medical needs from October 2016 until December 2017, gave deposition testimony regarding Corizon's treatment of Plaintiff Kensu.

69.   During questioning regarding Corizon's policy of denying claims for necessary medical treatment, when McKissick was asked, under oath, how

often Corizon would deny claims for consults with specialists, McKissick responded that "90 percent, 99 percent of the time" Corizon would deny the physician's request.[7]

70. Keith Papendick, Corizon Utilization Manager, states that Corizon does not deny. They "defer." Rather than outright "deny" treatment, Corizon "defers" the treatment. This "deferral" has the same substantive effect on the patient as an outright denial. The patient never receives the treatment. This policy, practice, or custom of "deferring" requests is in deliberate indifference to a prisoner's serious medical needs.

71. When P.A. McKissick says the policy to deny 90% to 99% of all requests, she means that 90% to 99% of all requests are "deferred."

72. McKissick further testified that all of her recommendations for a consultation with a specialist were based upon her experience as a physician's assistant and the standard of care necessary to properly treat the patient. Corizon "deferred" those recommendations, the recommendations of a physician for treatment necessary to provide adequate healthcare to a patient for their serious medical needs, 90% to 99% of the time.

73. Plaintiff and the Class have collected thousands of denials of claims, and thousands of instances in which Defendants refused to provide adequate

---

[7] McKissick Deposition Testimony at p. 60.

care to prisoners.

74.    Defendants have one single individual, Keith Papendick, who reviews requests for care by treating health care providers.  On an average day, he reviews more than 100 requests for care which means he spends, on average, less than five minutes on each case.  In doing his review, he does not review the medical records of the patients, but only the request completed by the prisoner's treating physician.  If that request does not contain information which Papendick believes is necessary, he simply "defers" the request.  The effect of a "deferral" is to deny the prisoner the requested care.

75.    If a treater has the time, a treater can respond to the "deferral".  Because of the workload of the treaters at the facilities, this is often difficult or impossible.  A treater can also appeal the decision, but once again, this requires time which the treaters do not have given the workload.  According to Marianne McKissick discussed above, she was unaware that there was an appeal process and never appealed these "deferral" decisions.

76.    During the time period of Corizon's contract with the MDOC, Defendants Corizon and QCC was directly responsible for the treatment of Plaintiff and the Class, and has at the very least implicitly approved, authorized, or acquiesced in the deliberate indifference to Plaintiff and the Class's serious medical needs. In fact, Defendant Corizon leads by example, so to speak, by

allowing and encouraging their subordinates to be deliberately indifferent to prisoners' serious medical needs, as is demonstrated by numerous verdicts across the country against Corizon finding them both liable for deliberate indifference violations and awarding both compensatory damages as well as punitive damages to plaintiffs. These verdicts, however, did not have the desired effect declared by the legislature's purpose in enacting punitive damages in civil rights cases, since it did not deter them or others from engaging in similar misconduct.

77.  Defendants Corizon and QCC could have authorized Plaintiff and the Class's required surgeries, or any other treatments needed to address their serious medical needs, but chose not out of deliberate indifference to Plaintiff's serious medical needs. They chose to let Plaintiff and the Class suffer. They also actively participated in the mistreatment of Plaintiff and the Class by "deferring" Plaintiff and the Class's required medical treatment.

78.  Defendants Corizon and QCC have a policy, practice, or custom to "defer" at least 90% of surgery requests, regardless of medical necessity. Further, Defendants Corizon and QCC have a policy, practice, or custom to deny any surgery request that requires an overnight stay. These policies are not for any medical purpose. On the contrary, it is only to increase Corizon's and QCC's profits. Such a policy, practice, or custom of action and/or inaction by doctors

charged with treating patients demonstrates clear deliberate indifference to Plaintiff and the Class and directly caused Plaintiff and the Class's complained-of injuries.

79. Defendants Corizon and QCC have policy, practice, or custom of providing inadequate medical care to prisoners housed in jails and correction facilities nationwide.

80. Defendants Corizon and QCC, through its employees, officers, and agents, routinely acted according to a plan or policy to deny Plaintiff and the Class access to treatment for their serious medical needs.

81. Defendants Corizon and QCC, through its employees, officers, and agents, acted to approve of the abuse and denial of Plaintiff and the Class's constitutionally protected access to treatment for their serious medical needs.

82. Defendant Corizon's and QCC's actions were and are clear violations of the Eighth Amendment of the Constitution, as Defendant Corizon and QCC routinely demonstrated deliberate indifference to Plaintiff and the Class's serious medical needs.

83. Defendant Corizon and QCC acted to approve of the abuse and denial of Plaintiff and the Class's constitutionally protected access to treatment for their serious medical needs.

84. Defendant Corizon's and QCC's decision to withhold appropriate medical

care and treatment from Plaintiff and the Class as described herein with deliberate indifference to Plaintiffs' serious medical needs, while Plaintiffs were in the MDOC's custody, violated their constitutionally protected rights.

85. Defendant Corizon's and QCC's plan or policy to unreasonably deny or "defer" prisoners' access to adequate medical treatment for their serious medical needs is evidenced across a long history of numerous claims, lawsuits, and grievances.

### D. DEFENDANT CORIZON, INC.'S POLICY, PRACTICE, OR CUSTOM OF DELIBERATE INDIFFERENCE TO THE TREATMENT OF PRISONERS IS WIDESPREAD AND AFFECTS PRISONERS ACROSS THE COUNTRY

86. Hundreds, if not thousands of causes of action have been filed throughout the United States against Corizon.

87. In these causes of action, the common allegation was Defendant Corizon's deliberate indifference to the medical needs and care of prisoners detained in the correctional facilities where Corizon was responsible for providing medical and mental health services.

88. Evidence of Corizon's policy, practice, or custom of deliberate indifference to the treatment of prisoners is widespread and affects prisoners across the country.

**Arizona**

89.   Corizon provided healthcare services for the Arizona Department of Corrections.

90.   In 2014, the Arizona State Board of Nursing conducted an investigation of a former Corizon nurse at the ASPC-Lewis prison, Patricia Talboy ("Talboy"), who was accused of using the same needle to check prisoners' blood sugar and draw insulin from vials of that medication to administer to multiple prisoners, which potentially contaminated the vials and exposed two dozen prisoners to HIV or hepatitis.

91.   After Talboy administered the insulin to various prisoners, the Corizon nurse returned the vials to the insulin inventory and other staff members may have unknowingly used those vials to dispense insulin to prisoners.

92.   Talboy's failure to follow procedures was discovered after a prisoner told a different nurse about her conduct.

93.   Talboy's license was subsequently suspended.

94.   Although Corizon was fully aware of Talboy's wrongful conduct, they delayed reporting the incident for three days and in a press release admitted that one of its nurses had failed to follow the proper procedure to administer medication by injection.

95.   After Talboy's wrongful conduct was disclosed, Corizon was ordered to develop a comprehensive training and competency plan for blood glucose

testing and the administration of insulin, nurse-peer reporting education to ensure professional accountability and "patient awareness education on injection protocols."

## California

96.   Corizon provided healthcare services for Alameda County, California.

97.   On August 13, 2010, Martin Harrison ("Harrison") was detained at the Alameda County Santa Rita jail after being arrested for a failure to appear warrant.

98.   During the intake process, Harrison advised a Corizon nurse that he drank alcohol daily, including the date of his arrest, and he had a history of alcohol withdrawal, which the nurse recording in his medical file as CIWA, Clinical Institute Withdrawal Assessment ("CIWA"), an evaluation which identifies individuals who are at risk for severe alcohol withdrawal and a treatment plan for safe detoxification.

99.   Although Harrison was placed on CIWA, neither the Corizon medical or nursing staff completed the CIWA screening questionnaire consistent with Alameda County and Corizon's policies, procedures, and training, or further examined Harrison.

100.   Two days later, on August 15, 2010, Harrison requested medical care, but Corizon personnel did not immediately respond to his request and only did

so two days later after he was severely beaten and tased by jail deputies.

101.    On August 16, 2010, Harrison began to experience severe alcohol withdrawal and a life-threatening medical emergency, commonly known as Delirium Tremens, due to this withdrawal.

102.    Corizon personnel were fully aware that Harrison was at risk to experience significant alcohol withdrawal episodes, including psychiatric impairments, but they did not provide Harrison with any medical attention or care prior to or during the period of time that he experienced a life-threatening alcohol withdrawal medical emergency.

103.    Corizon medical personnel were deliberately indifferent to Harrison's medical needs and failed to timely respond to those needs.

104.    After experiencing a life-threatening medical emergency and being beaten by jail deputies a number of times, Harrison suffered anoxic brain damage after cardiac arrest and was brought to the jail infirmary and then a hospital.

105.    While at the hospital, Harrison suffered from severe acidosis, experienced cardiac arrest and respiratory failure, and on August 18, 2010, Harrison passed away.

106.    On June 10, 2011, Harrison's estate filed a cause of action against Alameda County and Corizon and asserted that Corizon nurses failed to provide adequate and timely medical care for Harrison prior to and during a life-

threatening medical emergency, Delirium Tremens.

107.   In March of 2015, Corizon and Alameda County entered into a settlement agreement with Harrison's estate and agreed to pay $8.3 million and Corizon Health, Inc. and Alameda County also agreed to an injunction due to the inadequate medical care provided to prisoners in the State of California with oversight by the Honorable Jon S. Tigar for five years.

**Florida**

108.   Corizon provided healthcare services for the Florida Department of Corrections.

109.   On July 6, 2007, Brett Fields ("Fields") was detained at the Lee County Jail to serve a sentence after being convicted of two misdemeanors.

110.   Fields was a relatively healthy twenty-four-year-old, except he had a bump the size of a tennis ball on his left arm from a spider bite.

111.   Fields received sporadic and inadequate treatment from Corizon medical personnel.

112.   On August 6, 2007, his back felt sore and numb. The following day, his legs twitched uncontrollably, and after midnight on August 8, 2007, the pain escalated to an unbearable level.

113.   On August 8, 2007, at approximately 9:00 am, Fields, who could barely walk, was examined by a physician's assistant who checked his leg and foot

reflexes, gave him some Tylenol, and sent him back to his cell.

114.   On August 9, 2007, Fields he felt his intestines protruding from his rectum. Fellow prisoners begged Corizon's staff to take him to a hospital. Instead, the Corizon nurse obtained some K-Y Jelly and pushed the intestines back into his rectum.

115.   Fields was subsequently brought to a hospital hours later and examined by a doctor who found an abscess compressed against his spine.

116.   Fields filed a cause of action against Corizon's predecessor, PHS, for violations of his Eighth Amendment rights and asserted that PHS had a pattern, practice, policy, and custom of providing deficient medical care.

117.   The cause of action filed by Fields proceeded to trial and the jury found that Fields had a serious medical need, PHS was deliberately indifferent to that serious medical need, the company's actions proximately caused Fields' injuries, and PHS had a custom or policy of deliberate indifference that violated Fields' right to be free from cruel and unusual punishment.

118.   The jury awarded Fields $700,000 in compensatory damages and $500,000 in punitive damages.

119.   Corizon appealed the jury verdict and on September 6, 2012, in an unpublished opinion in *Fields v. Corizon Health*, 490 Fed. Appx. 174 (11th Cir. 2012), the Eleventh Circuit Court of Appeals affirmed the $1.2 million

Florida jury verdict that found Corizon, when it was operating as PHS, had a policy or custom of refusing to send prisoners to hospitals.

120. The Eleventh Circuit Court of Appeals held that it was reasonable for jurors to conclude that PHS had delayed medical treatment in order to save money.

121. Other instances of Corizon's deliberate indifference are demonstrated by verdicts across Florida.

122. From 2002 to 2004, Corizon provided medical care at the Palm Beach County Jail. During this period of time, two prisoners died because Corizon medical personnel withheld their medication, including one HIV-positive patient who was treated with Tums. County judges released two other prisoners so that they could get medical care. In another instance, the health department threatened legal action if the jail did not control a potentially deadly infection that had rapidly spread throughout the facility.

123. In 2007, Corizon provided medical and mental healthcare services at the Volusia County Branch Jail.

124. That year, Ronald Wadsworth, a mentally handicapped forty-three-year-old man who had Parkinson's disease, was arrested due to a lack of supervision in a group home and transported to the Volusia County Branch Jail.

125. While incarcerated at the Volusia County jail, Wadsworth received twenty-three bed sores and contracted a staph infection.

126. Wadsworth was subsequently transferred to a nursing and rehabilitation center and passed away the next day.

127. Wadsworth's estate filed a cause of action against Volusia County, Florida and the Corizon's predecessor, PHS, which alleged deficient medical care.

128. The action filed against Volusia County, Florida and Corizon eventually settled pursuant to a confidential settlement agreement.

129. In 2007, Ciara-Paige Green, who suffered from mental illness, was sentenced to serve one hundred and eighty days at the Volusia County Branch Jail.

130. Subsequent to Ms. Green's commitment at the Volusia County Branch Jail, the correctional facility's mental health care provider, Corizon, did not provide her with the medication prescribed to treat her mental illness.

131. Ms. Green's condition deteriorated to the point that she was held in solitary confinement for one hundred and seventy-seven days. She was subjected to being pepper-sprayed and strapped in a restraint chair before she was transferred to a state mental hospital.

132. In 2008, Volusia County removed Corizon as its mental healthcare provider at the Volusia County Branch Jail.

133. In 2009, in Volusia County, Florida officials held a hearing, questioned Corizon executives about lawsuits filed against the company and its

financial stability.

134.   Volusia County, Florida county officials unanimously voted to terminate Corizon's contract to provide healthcare services at the county jails and subsequently canceled Corizon's healthcare contract.

135.   In 2009, Collier County Jail prisoner Joan Graeber lost her baby after Corizon staff delayed treatment for a blood condition lethal to the fetus.

136.   In 2014, two state prison inmates who had cancer were treated by Corizon medical personnel with just Tylenol and ibuprofen as their undiagnosed serious medical condition progressed. As a result, one of the prisoners passed away and the other prisoner is dying.

137.   The Florida corrections commissioner wrote a letter to Corizon to address the substandard medical care or the State would consider withholding payment pursuant to the contract.

138.   In 2014, three hundred and forty-six prisoners died in Florida prisons, the highest number on record, although the overall prison population in Florida had declined.

139.   In February 2015, Senator Greg Evers, chairman of the Senate Criminal Justice Committee, ordered the Florida Department of Corrections Secretary Julie Jones to renegotiate Corizon's contract due to a series of reports by the Miami Herald and other media organizations about suspicious deaths that

were covered up or never investigated, inadequate staffing, and prisoner grievances or complaints of harmful medical care that were dismissed or ignored.

140. When the state originally turned to Corizon's privatized prison health system to service prisoners housed in their correctional facilities, within 100 days of Corizon taking over, prisoner deaths spiked to a ten-year high that continued for months.[8]

141. Former Florida Department of Corrections Secretary Michael Crews commented that as soon as Corizon took over prisoner care, for the vast majority of state prisoners, "the level of care continues to fall below the contractually required standard."[9]

142. Moreover, in 2014, a report was released documenting a Florida woman's struggles to receive adequate treatment from Corizon's corrections-based healthcare program, as her undiagnosed lung cancer was treated by Corizon doctors with Tylenol.[10]

143. Further, evidence of Corizon's policy to deny or "defer" physician's referrals for necessary medical treatment is well documented across

---

[8] https://www.mypalmbeachpost.com/news/inmate-was-getting-only-tylenol-for-cancer/luLV1P4koWjXqCau46piMK/
[9] https://www.mypalmbeachpost.com/news/inmate-was-getting-only-tylenol-for-cancer/luLV1P4koWjXqCau46piMK/
[10] https://www.mypalmbeachpost.com/news/inmate-was-getting-only-tylenol-for-cancer/luLV1P4koWjXqCau46piMK/

numerous correctional facilities throughout the nation. In Florida, after Corizon took over, the number of inmates referred to hospitals from Corizon for treatment of their serious medical needs plunged 47 percent. As one physician commented, "we order surgery and they don't come in. They are dying before they get to surgery."[11]

**Idaho**

144. Corizon provided healthcare services for the Idaho Department of Corrections, which included a contract to provide health care services at Idaho State Correctional Institution ("ISCI").

145. The quality of medical care at the Idaho State Correctional Institution ("ISCI") in Boise had been an ongoing issue for nearly three decades and a class-action lawsuit was filed on behalf of Walter Balla and other prisoners, which became known as the Balla litigation and alleged a variety of problems, including inadequate health care.

146. Dr. Ralph Heckard, who contracted with Corizon's predecessor, CMS, to treat prisoners at ISCI, reported that there was only one doctor for every one thousand five hundred patients, compared to a statewide average of one doctor for every four hundred and fifty Idaho residents.  Similarly, it was

---

[11] https://www.mypalmbeachpost.com/news/inmate-was-getting-only-tylenol-for-cancer/luLV1P4koWjXqCau46piMK/

reported that ISCI did not have a pharmacist, and unlicensed and unauthorized medical personnel administered injections to prisoners.

147.  Dr. Heckard reported that prisoners often had to wait weeks for medical care, including one prisoner who had a biopsy and CMS delayed the prisoner's recommended surgery and chemotherapy.

148.  Other prisoners were deprived of necessary and expensive medication due to the lack of a psychiatrist to renew their expiring prescriptions because CMS would not allow primary care doctors including Dr. Heckard to prescribe or renew any psychoactive medications.

149.  In 2010, a doctor Corizon hired to work in an Idaho prison quit after six months because unqualified medical personnel handled medical care and pharmacy operations that did not comply with the law.

150.  The doctor reported the unlawful practices to the state medical boards and a federal judge subsequently appointed a monitor to report on the medical care at the prison.

151.  In July 2011, after new complaints were filed regarding medical care at ISCI, United States District Court Judge B. Lynn Winmill appointed a special master, Dr. Marc F. Stern, to assess the situation at the facility.

152.  Dr. Stern, with the assistance of psychiatrist Dr. Amanda Ruiz Stern and his team, observed ISCI over a six-day period and met with dozens of prisoners,

administrators, and Corizon employees.

153.  In February 2012, Dr. Stern issued a scathing report, citing serious problems with the delivery of medical and mental health care, which caused or risked causing serious harm to prisoners at ISCI and that the conditions violated the rights of prisoners at ISCI to be protected from cruel and unusual punishment.

154.  Dr. Stern reported that many of the problems were frequent, pervasive, longstanding, and authorities were or should have been aware of the problems and opined that the authorities were deliberately indifferent to the serious health care needs of the prisoners.

155.  Dr. Stern's findings cited prisoner sick call requests which resulted in no care, delayed care or treatment that was deemed dangerous, emergency care situations had insufficient oversight, delays or no response and inadequately trained medical staff operated independently during emergencies without oversight from an RN or physician.

156.  In one case, a prisoner with a "history of heart disease was inexplicably dropped from the rolls of the heart disease Chronic Care Clinic." The medical staff stopped conducting regular check-ups, and a few years later, during a routine medical examination, the prisoner complained of occasional chest pain.  No evaluation or treatment was ordered and the

prisoner died four days later due to a heart attack.

157. In another case, Corizon staff failed to notify a prisoner for seven months that an x-ray indicated that he may have cancer.

158. Dr. Stern's report not only reviewed processes but also staff competency and adequacy and cited allegations that a dialysis nurse at ISCI had a disdain for prisoners and routinely failed to provide food and water to patients during dialysis, prematurely aborted dialysis sessions or simply did not provide the patients dialysis at all and failed to provide ordered medications which resulted in patients becoming anemic.

159. Dr. Stern concluded that prison officials were aware of this issue and the danger it presented to prisoners but delayed any corrective action.

160. The mental health care provided by Corizon was found to be deficient by Dr. Ruiz, who conducted the psychiatric portion of the court-ordered review.

161. Dr. Ruiz's report noted that the facility had (1) inadequate "screening of and evaluating prisoners to identify those in need of mental health care," (2) "significant deficiencies in the treatment program at ISCI" which was "violative of patients constitutional rights to health care," (3) an "insufficient number of psychiatric practitioners at ISCI, " (4) incomplete or inaccurate treatment records, (5) problems with psychotropic medications, which were prescribed with no face-to-face visits or follow up

visits with prisoners and (6) inadequate suicide prevention training.

162. Idaho state officials fined Corizon nearly four hundred thousand ($400,000.00) dollars due to its failure to meet some of the State's most basic health care requirements, including, the lack of an OB/GYN at the South Boise Women's Correctional Center for two years and the Idaho Maximum Security Institution was without a staff psychologist for eight months although Idaho required that Corizon fill the vacant positions in sixty days.

## Indiana

163. Corizon provided healthcare services throughout Indiana.

164. In 2012, Rachel Wood ("Wood") experienced bleeding from her eyes and nose. Corizon medical personnel summoned an ambulance and directed the ambulance to take Wood to a long-term care facility and rather than a hospital.

165. When Wood arrived at the long-term care facility, she had passed away.

166. It was reported that Wood had more than three-thousand six-hundred nanograms of an antidepressant, Citalopram, in her system, which was well above the 120 nanogram recommended dosage.

167. A medical examiner ruled that Wood's death was the result of a "therapeutic misadventure" and medical error.

168. Corizon subsequently lost its contract with the Indiana Department of

Corrections.

## **Kentucky**

169. Corizon provided healthcare services for the Metro Department of Corrections in Louisville, Kentucky at the Louisville Metro Corrections ("LMC") jail.

170. During Corizon's 2012 contract at LMC, seven healthcare-related deaths occurred in a seven-month period.

171. In April 2012, Samantha Sparks ("Sparks"), a heroin addict and mother of three, was arrested and held on shoplifting charges at the LMC jail. While withdrawing from heroin, Sparks vomited, sweated profusely, could not sit up, eat or drink, and defecated and urinated on herself. Six days later she was dead.

172. According to the medical examiner, Sparks' death was due to "complications of chronic substance abuse with withdrawal."

173. A wrongful death action was filed against Corizon and LMC employees in the Jefferson County, Kentucky Circuit Court, case number 13-CI-001848, which alleged that Corizon and LMC employees were negligent in failing to provide treatment for the Sparks' opiate addiction and withdrawal.

174. Corizon settled the cause of action under confidential terms.

175. Four months after Sparks' death, on August 8, 2012, another LMC prisoner,

Samantha George ("George"), died.

176. George's estate filed a wrongful death cause of action in Jefferson County Circuit Court against Corizon and the prison director due to her death.

177. The complaint alleged that while at LMC, George informed a Corizon nurse that she was a severe diabetic, needed insulin, and was feverish and in pain from an MRSA infection.

178. The Corizon nurse subsequently notified an on-call Corizon physician, who was not located at the facility and could not examine George in person to decide if she should be taken to an emergency room, but the doctor recommended monitoring George overnight and indicated he would see her the next day, which according to the complaint never occurred.

179. George's condition rapidly deteriorated while she was monitored by staff at the jail. She was found unresponsive a few hours after being admitted to the facility and pronounced dead a short time later.

180. The case was removed to federal court, then remanded to the county circuit court in October 2013. *George v. Corizon*, U.S.D.C. (W.D. Ky.), Case No. 3:13-cv-00822-JHM-JDM.

181. Shortly after George's death, Kenneth Cross ("Cross") was booked into the LMC jail on a warrant for drug possession. During the intake process, a nurse documented that Cross had slurred speech and that he fell asleep

numerous times during the medical interview.

182.    Several hours later, Cross was found unconscious and died shortly thereafter due to a drug overdose.

183.    Cross's estate filed a cause of action which alleged that Corizon employees at the LMC jail were deficient in recognizing and treating prisoners' substance abuse problems and that the facility was inadequately staffed for such medical care.

184.    After the deaths of Sparks, George, Cross and four other prisoners in 2012, LMC director Bolton determined that Corizon had taken an unreasonable amount of time to evaluate and treat prisoners at the jail.

185.    An internal investigation was conducted and in December 2012, six unidentified Corizon employees at the LMC jail resigned.

186.    In January 2014, the Louisville Metro Police's Public Integrity Unit concluded investigations into three of the deaths at the jail and criticized both Corizon and LMC.

187.    The Commonwealth Attorney's Office found that Sparks' and George's deaths were preventable.

**Maine**

188.    Corizon provided healthcare services for the Maine Department of Corrections.

189.  In 2011, Maine's legislature's Office of Program Evaluation and Government Accountability ("OPEGA") contracted with an independent consultant, MGT of America, to review of medical services in state prisons, which included services provided under Corizon's predecessor company CMS.

190.  The OPEGA report was issued in November 2011 and cited various deficiencies in medical care at the Maine prisons including the improper administration of medications and recording by CMS staff.

191.  The OPEGA report further stated that the company was notified of the problem but did not take any corrective action and CMS employees did not follow policies related to medical intake and medical records.

192.  The OPEGA reported that 38% of prisoner's medical files had inadequate or inaccurate documentation regarding physical assessments, that prisoners' medical files were not complete or consistently maintained, and that eleven percent of sick calls reviewed either not resolve in a timely manner or had no documented resolution.

193.  The State of Maine terminated its $19.5 million contract with Corizon, awarded the contract to another company, and the medical care at prisons in Maine significantly improved.

**Michigan**

194. A Michigan judge who oversaw a Michigan class-action suit that alleged substandard medical and psychiatric care by Corizon predecessor, CMS.

195. One of the cases involved a psychotic twenty-one-year-old who was strapped to a concrete slab for four days when the heat index was approximately one hundred degrees.

196. A doctor examined the prisoner one time without checking his vital signs and on the fourth day, a nurse detected a slight pulse but did not take any further action except to leave the cell. The prisoner died an hour later.

197. The judge who presided over the class-action case was informed of the incident and the prisoner's death and ordered a number of changes, stating "The days of deadwood in the Department of Corrections are over, as are the days of CMS intentionally delaying referrals and care for craven profit motives."

**Minnesota**

198. Corizon provided healthcare services for the Minnesota Department of Corrections.

199. While at the Minnesota Correctional Facility-Rush City, on June 28, 2010, Xavius Scullark-Johnson ("Scullark-Johnson"), an individual with schizophrenia, suffered at least seven seizures in his cell. He was found soaked in urine on the floor of his cell in a fetal position in an altered state

of consciousness. The nurses and guards did not provide any medical care for nearly eight hours.

200. An ambulance was called several hours later, but a nurse at the correctional facility dismissed the ambulance allegedly due to protocols to cut costs.

201. A lawsuit was filed, *Scullark-Johnson v. Garin*, U.S.D.C. (D. Minn.), case number 12-cv-01505-RHK-FLN, which Corizon settled in June 2013 for an undisclosed sum.

202. Nine prisoners died and another twenty-one suffered serious or critical injuries in Minnesota Correctional Facilities due to the delay or denial of medical care by Corizon or its predecessor CMS. As a result, the Minnesota Department of Corrections was held liable for nearly $1.8 million in wrongful death claims and medical negligence during the period of time when the state contracted with Corizon or CMS.

203. In 2013, the State of Minnesota did not accept Corizon's bid for the new contract although it submitted the lowest bid.

## **Missouri**

204. On May 25, 2009, Courtland Lucas ("Lucas"), a prisoner at the St. Louis Jail, died from complications of a heart problem, congenital aortic valve stenosis, while under the care of CMS.

205. In 2012, Corizon was sued for alleged missteps in connection with Lucas'

death.

206. In 2014, Corizon settled the case for an undisclosed amount of money.

**New Mexico**

207.  The denial of one man's access to adequate tests, scans, and further treatment resulted in his death at the hands of Corizon.

208. Adonica Gravengood, a Corizon patient housed in the Lea County Correctional Facility, pled Corizon for months to provide him adequate medical treatment to address debilitating stomach pain; only to be given over the counter antacids and aspirin.

209. Following several weeks of unnoticed warning signs and a failure of Corizon physicians to properly diagnose and treat his condition, Gravengood fell off his top bunk of his cell, eventually dying from an untreated duodenal ulcer "writing in pain and bleeding internally until he stopped breathing and his heart stopped" on the floor of a Corizon infirmary.

**New York**

210. In 2015, the New York City Department of Investigations investigated the healthcare services provided by Corizon at Rikers Island and found that missteps by Corizon employees may have contributed to at least two recent prisoner deaths.

211. In one instance, a prisoner was left dying and untreated for six days while

correctional officials and Corizon doctors, mental health clinicians and nurses made fifty-seven visits to his cell and did not render any medical care to him.

212. New York City investigators found that for eighty-nine of the one hundred and eight personnel files of health care workers they reviewed, there was no evidence that Corizon conducted any background check of the medical personnel it hired as medical staff.

213. In 2015, Corizon was fired by New York City after its Department of Investigation due to inadequate medical care and the discovery that Corizon hired doctors and mental health workers who had disciplinary infractions and criminal convictions for murder and kidnapping.

**Oregon**

214. Corizon provided healthcare services at the Lake County, Oregon Jail.

215. In February 2013, Kelly Green ("Green") who was detained at the Lane County, Oregon Jail, attempted suicide. Corizon misdiagnosed his injuries and failed to transport him to a hospital for six hours.

216. Green was paralyzed from his injuries, relied on a ventilator to sustain his life for ten months and subsequently passed away.

217. On August 6, 2015, Corizon and Lane announced they would pay $7 million to Green's family.

218.  Corizon also provided healthcare services at the Washington County Jail in Hillsboro, Oregon.

219.  In March 2014, Alexander Heap ("Heap"), a prisoner at the Washington County Jail in Hillsboro, Oregon, filed a complaint in the United States District Court for the District of Oregon, Portland Division, against the county and Corizon for negligence, defective health care policies, mistreatment by guards and medical personnel and intentional infliction of emotional distress due to delayed medical treatment. *Heap v. Wortham*, case number 3:14-cv-00105-ST.

220.  In February 2015, Corizon entered into an agreement with Heap to settle the case.

221.  In mid-March 2013, Marco Antonio Jimenez Ramos ("Ramos") was detained at the Washington County Jail. Over the course of five weeks, Corizon medical personnel forced Ramos to take the wrong medications, which caused a variety of additional health-related issues.

222.  In May 2014, Ramos filed a complaint against the county and Corizon for violations of his Fourth, Eighth, and Fourteenth Amendment constitutional rights and asserted that he was damaged by the defendant's acts and conduct. Specifically, he endured vomiting and defecating blood, loss of appetite, extreme panic attacks, pain and suffering, humiliation, mental and

psychiatric problems, anxiety, nervousness, fear, trauma, emotional distress, paranoia, depression, nightmares, and related serious medical needs.

223. In December 2014, the parties in the Ramos case entered into a settlement agreement.

224. Corizon was replaced as the healthcare provider for the Washington County Jail in Hillsboro, Oregon after an audit revealed that Corizon provided inadequate prisoner medical care and cost the county hundreds of thousands of dollars.

225. The audit criticized the county's oversight of the medical services provided by Corizon and Corizon's failure to adequately staff the medical unit at the Washington County Jail during all shifts and to reasonable assure officials that it provided quality care to prisoner patients.

226. As a result of the scathing audit, Washington County terminated Corizon's contract to provide healthcare at the Washington County Jail two years before its expiration.

**Pennsylvania**

227. Corizon provided healthcare services in Allegheny County, Pennsylvania.

228. On September 30, 2013, prisoner Milan Karan ("Karan") jumped from the top tier of a pod at the Allegheny County Jail. Despite his significant injuries, he was not transported to the hospital until the next day.

229. On November 17, 2013, the Allegheny County Jail Deputy Warden Monica Long sent an e-mail to Corizon complaining that the majority of the jail prisoners had not received their medication and that Corizon staffing was at a crisis level.

230. Corizon vice president Lee Harrington ("Harrington") denied any knowledge of staffing issues at the Allegheny County Jail even though he had previously received emails from the warden about that specific issue.

231. Prior to Corizon accepting the contract to provide healthcare services at the Allegheny County Jail, Corizon was aware that it was critical for the jail to be adequately staffed with medical personnel at all times.

232. Despite this knowledge, Corizon laid off many employees of the former healthcare provider, Allegheny Correctional Health Services (ACHS"), which consisted of four full-time and one part-time physician during its healthcare provider contract.

233. Corizon reduced the number of physicians by seventy-five percent, specifically to one full-time and one part-time physician.

234. Corizon workers approached a United Steelworkers union representative to unionize due to intolerable work conditions and a petition to unionize Corizon employees at the Allegheny County Jail was filed with the National Labor Relations Board.

235.   Randa Ruge, a United Steelworkers union representative, reported Corizon employees were in danger of losing their licenses due to Corizon's policies and protocols, stating that the jail had been without insulin for more than a week and Corizon executives had rescinded doctors' orders.

236.   After the union petition was filed, Corizon fired a Catholic nun, Sister Barbara Finch, a registered nurse, for publicly expressing her concerns about staffing, patient care, and safety at the Allegheny County jail.

237.   On September 1, 2015, as a result of the death of eleven prisoners, including the death of two prisoners on May 20 and 21, 2015 due to inadequate medical care, Corizon was terminated three years early as the healthcare provider at the Allegheny County Jail and the county took over healthcare at the jail.

**<u>All States</u>**

238.   Corizon's bid for correctional business emphasizes the successes of its own cost-containment strategies with a series of dramatic cuts, which come at the expense of prisoners and the standard of care they receive:

A.   In Maine in 2011, Corizon wrote, "We have developed a new working definition of 'medically necessary care,'" which cut visits to health care providers outside the prison by 30 percent.

B.   In New Mexico, a new system of monitoring psychiatric drug

prescriptions slashed monthly costs from $180,000 in 2007 to less than $30,000 in 2011, an estimated taxpayer savings of $2.1 million a year.[12]

239.   Corizon Inc. has a pattern of maximizing profit at the expense of patient care, including altering or destroying records and failing to provide necessary medical care to prisoners who were nearing release.

240.   In Georgia, a former Corizon physician commented that due to Corizon's policy and procedure to deny prisoner's access to medical treatment for their serious medical needs, Corizon physicians are "constantly under pressure…to make certain medical decisions in order to avoid costs."[13]

241.   Further reports evidence Corizon replacing prescription medications with over-the-counter painkillers as a cost-saving measure, at the expense of the prisoner.

242.    A 60-year-old Florida inmate diagnosed with rheumatoid and osteoarthritis, bursitis, fibromyalgia, tendinitis, a dislocated shoulder, and ruptured disks said he took Neurontin and another painkiller, Tramadol, for 10 years. Corizon's prison medical director stopped the Tramadol and cut the

---

[12] https://www.mypalmbeachpost.com/news/inmate-was-getting-only-tylenol-for-cancer/luLV1P http://www.santafenewmexican.com/news/local_news/lawsuit-claims-inmate-died-as-result-of-medical-negligence/article_249be171-4bb4-5654-a6cd-b5136c4fe0ce.html4koWjXqCau46piMK/

[13] http://www.santafenewmexican.com/news/local_news/lawsuit-claims-inmate-died-as-result-of-medical-negligence/article_249be171-4bb4-5654-a6cd-b5136c4fe0ce.html

Neurontin dosage in half.

243. Separately, a prisoner with a narrowing of spaces in the spine said state doctors prescribed Neurontin for three years to treat related nerve pain. "All that changed in November 2013," he said after Corizon began providing care. "I was told that the Aleve they gave me to replace the Neurontin I was on was the only thing I was going to get." When the prisoner asked why the doctor wrote first that the drug was no longer approved; when the prisoner persisted, the physician changed the explanation, writing that the prisoner no longer met criteria for getting the drug.[14]

244. Defendant Corizon has demonstrated deliberate indifference to Plaintiff and the Class's serious medical needs in violation of the Eighth Amendment.

245. Defendants' fraudulent policy, plan, or custom ensured that, when Plaintiff or a member of the Class presented Defendant with a claim from a physician for a referral to a specialist or a course of treatment deemed medically necessary to meet the individual's serious medical need, 90% to 99% of the time the individual's claim would be unreasonably denied.

246. Defendants' fraudulent policy, plan, or custom forced Plaintiff and the Class to endure pain, sickness, and anguish as a result of Defendants' routine

---

[14] https://www.mypalmbeachpost.com/news/inmate-was-getting-only-tylenol-for-cancer/luLV1P4koWjXqCau46piMK/

denial of Plaintiff and the Class' claims and referrals for treatment of their serious medical needs.

247. Defendants willfully and knowingly deprived and defrauded Plaintiff and the Class out of access to treatment, willfully breached contractual promises, and caused Plaintiff and the Class pain, suffering, grievance, loss, and emotional and mental distress. Defendants failed to take any fair, considerate, or reasonable steps to address their legitimate concerns, losses, or enumerated rights.

248. Defendants' numerous violations of Plaintiff and the Class's constitutional rights has caused significant damage and harm to Plaintiff and the Class.

249. As a result of the Defendants' conduct described herein, Plaintiff and the Class has suffered, and will continue to suffer violations of their Constitutional rights under the Eighth Amendment of the Constitution of the United States.

## FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF TEMUJIN KENSU

### A. PLAINTIFF TEMUJIN KENSU

250. Plaintiff Temujin Kensu ("Kensu") is a 55-year-old man who has been incarcerated in the Michigan Department of Corrections ("MDOC") for over thirty years. He has earned a reputation throughout the MDOC as a "troublemaker" due to his filing of numerous grievances and lawsuits aimed

at enforcing proper conduct of prison officials and ensuring their adherence to the United States Constitution, in addition to engaging in litigation for the purpose of ensuring proper treatment for his numerous serious medical needs. While it is undeniable that there are plentiful jailhouse lawyers who file numerous suits on behalf of prisoners, these lawsuits virtually always fail.

251.   In this aspect, Kensu has set himself apart from other prisoners by prevailing in some of his litigation. Kensu achieved a judgment in his favor against some MDOC officials in 1996 in the Michigan Western District Federal Court in *Kensu v. Cason*, 91-cv-00300-DWM. Additionally, he prevailed in an Eighth Amendment litigation against five MDOC officials on March 28, 2016, achieving a verdict totaling $325,002.00, case number 13-cv-10279-VAR-DRG. Of the damages awarded by the jury, $285,000.00 was assessed as punitive damages intended to punish the wrongful conduct of the MDOC and to deter similar conduct by others.

252.   While Kensu engaged in the past litigation to spur meaningful change and deter the defendants from continuing their harmful conduct, the verdict (unfortunately) has had the opposite effect; almost immediately after the verdict, the MDOC, Corizon, and QCC conspired to refrain from treating Kensu's serious medical needs, while at the same time attempting to protect

themselves from future litigation. Following the verdict, Defendants began falsifying medical records and wrongfully denying Kensu's access to care. Falsifying medical records had come up repeatedly in 13-cv-10279-VAR-DRG where it had become abundantly clear that the defendants were doing the same exact thing, which partially explains the high punitive damages award.

253.    Over the course of his incarceration, Kensu has been repeatedly and continually abused by many MDOC, Corizon, and QCC officials. This abuse became worse after he achieved the aforementioned verdict, as Defendants have combated Plaintiff Kensu through harmful retaliatory actions.

254.    Specifically, the Defendants, as is described herein, have taken affirmative steps in ensuring that Kensu does not receive medical care for his serious medical needs. To make matters even worse, they have prevented and blocked others from treating Kensu's serious medical needs.

255.    Further, Defendants have taken affirmative steps to ensure that medical devices which Kensu had in his possession and/or devices that other medical professionals had approved for him were taken away. These medical devices, which were approved by physicians to treat and alleviate conditions associated with Kensu's serious medical needs, were wrongfully removed, confiscated, or blocked from Kensu's use by Defendants in retaliation for his

verdict, grievances, and other litigation.  These past and continued actions by Defendants violate Kensu's First Amendment, Eighth Amendment, and Fourteenth Amendment rights, as Defendants are demonstrating deliberate indifference to Kensu's serious medical needs and continue to deprive him of his property without due process of law.

256. Defendants have engaged in a long history of misconduct, unfair treatment, and deliberate indifference to Kensu's serious medical needs.

257. Throughout the duration of Corizon and QCC treating prisoners housed in the MDOC, Plaintiff Kensu was deprived of access to medically necessary treatment for his serious medical needs.

258. Plaintiff Kensu has continued to seek medical care from Defendants only because he is forced to do so as there is no other available option.

259. Defendants have profited significantly from its denial of medical claims and refusal to properly treat Plaintiff and the Class.

260. Plaintiff Kensu's dealings and interactions with Defendants in connection with the treatment of his medical needs is typical of other prisoners seeking treatment from Defendants.

## B.  DEFENDANTS' DENIAL OF PLAINTIFF TEMUJIN KENSU'S TREATMENT OF SERIOUS MEDICAL NEEDS

261. Defendants, as is described herein, has taken affirmative steps in ensuring that Plaintiff Kensu does not receive medical care for his serious medical

needs. To make matters even worse, they have prevented others from treating Mr. Kensu's serious medical needs as well.

262.   There are several actors, officers, and agents authorized to act on behalf of Defendants who engaged in conduct to deprive Plaintiff and the Class of access to treatment for their serious medical needs.

263.   Kensu has been told by MDOC staff that they have been instructed to not treat him for a number of his ailments. He has been told by MDOC staff that this is instruction is coming from Lansing and from other agents, officers, directors, and employees of Defendant Corizon, QCC, and the MDOC.

264.   As recently as June 2017, Kensu was told by Defendant Physician's Assistant Kim Farris that she was ordered by Defendant Borgerding, former Corizon Acting Chief Medical Officer, not to treat any of Kensu's serious medical needs.

265.   Kensu has a long, documented history of many serious medical needs that affect his daily life. This history of serious medical need is documented via years of Kensu's requests for adequate treatment from Defendants.

266.   Kensu has suffered from, and continues to suffer from, many serious medical needs, including, but not limited to:

A. Benign Prostatic Hypertrophy

B. Severe Orthopedic needs, such as:

i. Painful and disabling arthritis of the neck with calcification, multiple bulging disks, spinal stenosis, and sphenoid sinusitis.

ii. Numerous back and spinal column diseases and disorders, including excruciatingly painful and often disabling spinal degenerative disk disease, disk compression, herniation, stenosis, Schmorl nodes, past fractures, straightening of the lumbar lordosis, and spondyloarthropathies.

iii. Kensu also has suffered from, and continues to suffer from, numerous severe, painful and often disabling joint tears and damage that include:

1. Tears of the rotator cuff with impingement in both shoulders;

2. X-ray confirmed osteoarthritis and edema with lesions of both knees with MRI confirmed tendon, ligament, bone and cartilage damage to the right knee; and

3. X-ray and exam confirmed damage to both ankles with documented and measured impingement in the left ankle caused by wedged, broken bone fragments from a never-treated prison work injury. Both ankles are significantly damaged, arthritic and painful.

    iv.  Kensu also has serious orthopedic medical needs in relation to his shoulders and knees, including:

        1.  Tricompartmental osteoarthritis, significant joint damage, cysts, condylar fractures, lesions, ACL and PCL thinning, etc.

C.  Rheumatological and Immunology needs, such as:

    i.  Progressive muscle loss and wasting disorder.

D.  Ear, Nose and Throat needs, such as:

    i.  Nasal polyps, which hamper his breathing, eustachian tube defects, and significant hearing loss with extreme tinnitus.

E.  Neurological needs, such as:

    i.  A brain tumor located in the 4th ventricle region near the base of the brain at the spinal junction.

    ii.  As a result of his brain tumor, in addition to the previously referenced multiple bulging disks, stenosis and sinusitis of the sphenoid region, Kensu frequently experiences severe, excruciating, and often debilitating migraines.

F.  Diet needs, such as:

    i.  A special medical diet to address many of Kensu's serious health issues. This diet is meant to control and treat Kensu's severe food

intolerances and mitigate inflammation and symptoms of his serious medical needs.

G. Bowel needs, such as:

    i. Dysentery colitis, multiple impactions requiring emergency surgery to remove nearly two feet of Kensu's sigmoid colon, additional complications and hospitalizations lasting years, post-surgical ileus, edematous tissue (i.e., inflamed, scar-like tissue that could be cancerous), and extremely low motility with blockages requiring daily colonic lavage to permit evacuation.

H. Medical Device Property needs, such as:

    i. Several accommodations and recommendations over the years to use medical devices to treat Kensu's various ailments because of his serious medical needs.

    ii. These accommodations and recommendations include ankle sleeves, corrective shoes, and braces, among many others.

267. For years, Kensu has experienced tremendous pain and other issues as a result of these serious medical issues. For years, Kensu has requested from Defendants treatment for his serious medical needs. For years, Defendants have denied Kensu's requests for treatment of his serious medical needs.

268. For many of Kensu's serious medical needs, Defendants routinely deny

Kensu access to medical devices that would provide treatment, in addition to denying Kensu access to specialists to provide the proper expert evaluation.

269.   While Kensu was once provided with medical accommodations, such as pain relief, supportive shoes, gel and arch insoles, ankle sleeves, joint compounds, and a surgical referral for repair of the left ankle, in retaliation for engaging in litigation, Defendants have now denied any and all care and consideration for many of these painful, disabling disorders.

270.   Despite Plaintiff Kensu's continued pleas, filed grievances, and lawsuits requesting that Defendants provide adequate medical care to treat his serious medical needs, Defendants engage in deliberate indifference to Kensu's serious medical needs in refusing to administer necessary medical care to treat Plaintiff Kensu.

271.   Defendants have engaged in hundreds of instances of deliberate indifference specific to Plaintiff Kensu.   There is no medical basis for Defendants' continued denials of Plaintiff's requests for care.  Defendants' actions are the result of a policy, practice, or custom of deliberate indifference in order to save money.

## C. PLAINTIFF KENSU'S FILED GRIEVANCES IN ATTEMPT TO RECEIVE MEDICALLY NECESSARY TREATMENT FROM DEFENDANTS

272.   Plaintiff Kensu has filed countless grievances in an attempt to receive

adequate medical treatment for his serious medical needs. Despite Plaintiff Kensu's continuous attempts to receive necessary medical treatment, Defendants' conduct continues to fall below any reasonable standard of care in deliberate indifference to Plaintiff Kensu's serious medical needs.

273. Plaintiff has previously exhausted all administrative remedies through the appropriate grievance process by filing numerous grievances, all of which were denied through Step 3 or simply ignored.

## CLASS ACTION ALLEGATIONS

274. Plaintiffs bring this action on their own behalf and on behalf of a proposed Class of all persons similarly situated pursuant to F.R.C.P. 23(b)(2) and 23(b)(3). This action is brought by named Plaintiff Temujin Kensu on behalf of all individuals who have been denied necessary medical treatment through Defendants' fraudulent and deceptive policies, practices, or customs to be deliberately indifferent to serious medical needs. Specifically, individuals who:

> Are or were prisoners incarcerated in facilities of the Michigan Department of Corrections, and beginning in 2014, through Defendant Corizon's contract with the MDOC to provide healthcare services to prisoners, were denied access to medically necessary treatment or services in deliberate indifference to the prisoner's serious medical needs.

275. Excluded from the Class are Defendants; any entity in which it has a

controlling interest; any of its parents, subsidiaries, affiliates, officers, directors, employees and members of their immediate families; members of the federal judiciary, and counsel for the parties.

276.  Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with Plaintiff's motion for class certification, or at any other time, based on, *inter alia*, changing circumstances and/or new facts obtained during discovery.

277.  *Numerosity:* This class is estimated to be composed of thousands of Michigan prisoners who were denied access to documented medically necessary treatment by Defendants, and is therefore so numerous that joinder of all members is impracticable. The disposition of their claims through this class action will benefit all Class Members, the parties, and the courts and is the most practical method for Plaintiff to challenge the policies, procedures, and practices of Defendants.

278.  *Existence and Predominance of Common Questions of Fact and Law*: There are questions of law or fact common to the members of the class such that common questions predominate over questions affecting only individual members.  Individual questions do not predominate over common questions because:

A.  Each member of the Class sought access to or approval of some type of medically necessary treatment following a referral or recommendation by a physician in the same or a substantially similar manner from Defendants;

B.  Each member of the Class who sought access to or approval of some type of medically necessary treatment following a referral or recommendation by a physician was denied access or approval by Defendants; and

C.  Defendants denied each member of the Class access to or approval of some type of medically necessary treatment according to Defendants' fraudulent and deceptive policies, practices, and customs to deprive Plaintiff and the Class from necessary medical care for their serious medical needs.

279.  Furthermore, Plaintiffs are not seeking monetary damages in this complaint. The only question is whether there is a pattern showing a policy or custom of acting with deliberate indifference to the serious medical needs of Plaintiff and the class.  The relief sought will not require individualized assessments of damages.

280.  There is a well-defined community of interest in questions of law and fact affecting the Class. These questions of law and fact predominate over

individual Class Members, including, but not limited to, the following:

A.  Whether, during the Class Period, Defendants unreasonably denied Plaintiff and the Class access to medically necessary treatment;

B.  Whether Defendants breached the duty of care owed to Plaintiff and the Class to provide healthcare services;

C.  Whether Defendants' policy of routinely denying or "deferring" medically necessary treatment necessitates declaratory relief under Michigan law;

D.  Whether Defendants' policy of routinely denying or "deferring" medically necessary treatment necessitates injunctive relief under Michigan law;

E.  Whether Defendants are likely to continue their policy, practice or custom denying or "deferring" prisoners medically necessary treatment, such that an injunction is necessary; and

F.  Whether Plaintiff and Class Members are entitled to an award of reasonable attorney's fees, pre-judgment interest and costs of suit.

281.  *Typicality*: The claims of the Class Representative are typical of, and not antagonistic to, the claims, violations of law, and resulting harms suffered by all Class members. Plaintiff and the Class have all been deprived of (or were likely to be deprived of) medically necessary treatment protected by

the Eighth Amendment of the United States Constitution by Defendants' fraudulent and deceptive policy, practice, or custom.

282. *Adequacy*: The Plaintiff Class Representative will fairly and adequately assert and protect the interests of the Class. Plaintiff's counsel knows of no conflicts of interest between the Class Representative and absent Class members with respect to the matters at issue in this litigation, the Class representatives will vigorously prosecute the suit on behalf of the Class, and the Class representatives are represented by experienced counsel.  Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation, in addition to civil rights litigation involving the prosecution of claims of deliberate indifference on behalf of a prisoner's Eighth Amendment rights.  Plaintiffs' attorneys have identified and investigated the claims in this action and have committed sufficient resources to represent the Class.

283. *Superiority*: The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice. Because of the nature of the relief sought few, if any, Class Members could afford to seek legal redress of the wrongs complained herein on an individual basis.  The prosecution of separate actions by individual members of the Class could result in inconsistent or

varying adjudications with respect to individual members of the Class. Absent class action, Plaintiff and Class Members would likely not recover, or would not likely have the chance to recover, the requested relief, and Defendants will be permitted to retain the proceeds of its misdeeds.

284. All Class Members, including Plaintiff, were exposed to one or more instances of Defendants denying or "deferring" their claims to medically necessary treatment as a result of Defendants' fraudulent and deceptive policies, practices, or customs. Due to the scope and extent of Defendants' consistent scheme, it can reasonably be inferred that such policy, practice, or custom was uniformly applied to all Class Members.

285. Plaintiff is informed and believes that Defendants keep extensive computerized records of all claims for treatment from prisoners through the MDOC. Defendants have one or more databases through which a significant majority of Class Members may be identified and ascertained, and it maintains contact information, including email and home mailing addresses, through which notice of this action could be disseminated in accordance with due process requirements.

286. A class action is an appropriate and superior method for the fair and efficient adjudication of the controversy given the following factors:

A. Common questions of law and/or fact predominate over any individual questions that may arise, and, accordingly, there would accrue enormous economies to both the Court and the Class in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

B. Class Members' claims for non-monetary relief will make individual litigation an economically viable alternative;

C. Despite the relatively small size of individual Class Members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigation; and

D. No unusual difficulties are likely to be encountered in the management of this class action in that all questions of law and/or fact to be litigated at the liability stage are common to the Class.

287. To the best of Plaintiff's knowledge, no other action is pending on the subject matter of this case in any Court.

288. As such, Plaintiff seeks class certification under F.R.C.P. 23.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## Declaratory Relief Under 28 U.S.C. § 2201
### (*Against all Defendants*)

289.  Plaintiff and the Class adopts by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

290.  By the acts and omissions described herein, Defendant Corizon and Defendant QCC violated 42 § U.S.C. 1983 and deprived Plaintiff and the Class of their well-settled constitutional rights pursuant to the Eighth Amendment of the United States Constitution.

291.  The Eighth Amendment of the United States Constitution protects individuals and guarantees the right to be free from, the deliberate indifference to Plaintiff and the Class's serious medical needs and the deprivation of basic human rights.

292.  A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.

293.  Defendant Corizon and Defendant QCC knew that Plaintiff and the Class had significant, serious medical needs.

294.  Defendant Corizon and Defendant QCC instituted a policy, practice, or custom whereby prisoners were unreasonably denied access to necessary medical treatment for their serious medical needs.

295.  Because of the nature in which Corizon is compensated, Corizon is

responsible for the costs of providing treatment to prisoners on an out-patient basis.  To the extent that Corizon denies care to prisoners with serious medical needs, Corizon does not have to incur costs for that care and keeps those costs as additional profit.  See Exhibit A, Contract, p. 53: " The MDOC will share savings 85/15 (85% to MDOC and 15% to the contractor) when actual costs are below the target.

296.  Defendant Corizon's and Defendant QCC's policy, practice, or custom of unreasonably denying access to treatment for a prisoner's serious medical needs is widespread and evidenced through Corizon's and QCC's conduct. Corizon's and QCC's policy, practice, or custom of being deliberately indifferent to a prisoner's serious medical needs includes, but is not limited to:

  A. Defendant Corizon's and Defendant QCC's policy, practice, or custom of "deferring" 90% to 99% of all physician-recommended referrals for surgery or consultations with specialists; and

  B. Defendant Corizon's and Defendant QCC's policy, practice, or custom of denying any outpatient surgery that required an overnight stay.

  C. Defendant Corizon's and Defendant QCC's policy, practice, or custom of ignoring treatment recommendations of specialists

selected by Defendants to assess the medical condition of Plaintiff and the Class.

D. Defendant Corizon's and Defendant QCC's policy, practice, or custom of disguising treatment denials as "deferments" in which prisoners never get needed treatment, despite recommendations by their treating physicians.

297. Defendant Corizon's and Defendant QCC's policy, practice, or custom of deliberate indifference to prisoner's serious medical need has no medical basis. Rather, Defendant Corizon and Defendant QCC engage in such conduct in order to save money.

298. As a result, Defendant Corizon and Defendant QCC failed to reasonably respond to Plaintiff and the Class's serious medical needs.

299. Corizon's actions across the United States demonstrate a pattern of deliberate indifference that can only be explained by a centralized policy within Corizon's management structure. QCC simply acts as the vehicle within Michigan to provide treatment to prisoners because a corporation such as Corizon cannot treat prisoners. QCC is a wholly owned subsidiary of Corizon.

300. An actual and justiciable controversy exists between Plaintiffs and Defendants concerning whether Defendants' actions denying access to

medical treatment violates Federal law.

301. Kensu has suffered from, and continues to suffer from, many serious medical needs, including, but not limited to:

I. Benign Prostatic Hypertrophy

J. Severe Orthopedic needs, such as:

    i. Painful and disabling arthritis of the neck with calcification, multiple bulging disks, spinal stenosis, and sphenoid sinusitis.

    ii. Numerous back and spinal column diseases and disorders, including excruciatingly painful and often disabling spinal degenerative disk disease, disk compression, herniation, stenosis, Schmorl nodes, past fractures, straightening of the lumbar lordosis, and spondyloarthropathies.

    iii. Kensu also has suffered from, and continues to suffer from, numerous severe, painful and often disabling joint tears and damage that include:

        1. Tears of the rotator cuff with impingement in both shoulders;

        2. X-ray confirmed osteoarthritis and edema with lesions of both knees with MRI confirmed tendon, ligament, bone and cartilage damage to the right knee; and

3. X-ray and exam confirmed damage to both ankles with documented and measured impingement in the left ankle caused by wedged, broken bone fragments from a never-treated prison work injury. Both ankles are significantly damaged, arthritic and painful.

    iv. Kensu also has serious orthopedic medical needs in relation to his shoulders and knees, including:

1. Tricompartmental osteoarthritis, significant joint damage, cysts, condylar fractures, lesions, ACL and PCL thinning, etc.

K. Rheumatological and Immunology needs, such as:

    i. Progressive muscle loss and wasting disorder.

L. Ear, Nose and Throat needs, such as:

    i. Nasal polyps, which hamper his breathing, eustachian tube defects, and significant hearing loss with extreme tinnitus.

M. Neurological needs, such as:

    i. A brain tumor located in the 4th ventricle region near the base of the brain at the spinal junction.

    ii. As a result of his brain tumor, in addition to the previously referenced multiple bulging disks, stenosis and sinusitis of the

sphenoid region, Kensu frequently experiences severe, excruciating, and often debilitating migraines.

N. Diet needs, such as:

    i. A special medical diet to address many of Kensu's serious health issues. This diet is meant to control and treat Kensu's severe food intolerances and mitigate inflammation and symptoms of his serious medical needs.

O. Bowel needs, such as:

    i. Dysentery colitis, multiple impactions requiring emergency surgery to remove nearly two feet of Kensu's sigmoid colon, additional complications and hospitalizations lasting years, post-surgical ileus, edematous tissue (i.e., inflamed, scar-like tissue that could be cancerous), and extremely low motility with blockages requiring daily colonic lavage to permit evacuation.

P. Medical Device Property needs, such as:

    i. Several accommodations and recommendations over the years to use medical devices to treat Kensu's various ailments because of his serious medical needs.

    ii. These accommodations and recommendations include ankle sleeves, corrective shoes, and braces, among many others.

302.   Plaintiff Kensu and the Class have repeatedly filed grievance claims and letters to officials seeking redress from the widespread and ongoing pattern of denial of claims necessary to address Plaintiff and the Class's serious medical needs.

303.   Defendant Corizon and Defendant QCC categorically refused and continues to refuse to adequately treat Plaintiff and the Class's serious medical needs, such that it rises to the level of deliberate indifference to their serious medical needs.

304.   Defendant Corizon's and Defendant QCC's failure to treat Plaintiff and the Class's serious medical needs resulted in further significant injury to Plaintiff and the Class.

305.   Defendant Corizon's and Defendant QCC's failure to treat Plaintiff and the Class's serious medical needs resulted in the unnecessary and wanton infliction of pain.

306.   Corizon's and QCC's decision to withhold appropriate medical care and treatment from Plaintiff and the Class as described herein with deliberate indifference to Plaintiff and the Class's serious medical needs while in the MDOC's custody violated Plaintiff and the Class's constitutionally protected rights.

307.   Corizon and QCC violated the Eighth Amendment of the United States

Constitution when they acted with deliberate indifference to Plaintiff and the Class's serious medical needs, exposing Plaintiff and the Class to an unreasonable risk of serious harm, as well as depriving them of their basic human needs.

308. Defendants' conduct is so constitutionally deficient that they cannot be left to themselves to monitor compliance. This has been demonstrated across the United States. The only way to ensure better compliance is by appointment of an independent medical monitor to oversee Corizon. Clearly, the Michigan Department of Corrections cannot serve this role as they have been involved in monitoring Defendants' compliance to date. To say that such monitoring has been a failure would be an understatement.

309. This claim for declaratory judgment is brought pursuant to 28 U.S.C. § 2201 *et seq.*, seeking a determination by the Court that:

    A. This action may proceed and be maintained as a class action;

    B. That Defendants' policies, practices, or customs of categorically denying or "deferring" Plaintiff and the Class access to necessary medical treatment for their serious medical needs violates the Eighth Amendment of the United States Constitution;

    C. An independent medical monitor should be appointed to oversee Defendant Corizon's and Defendant QCC's activities as a medical

provider in the MDOC;

D. Appointment of an independent medical ombudsman to assist and investigate prisoners' claims for medical care, as well as their denials of medical care;

E. Class Members are entitled to restitution and interest thereon;

F. An award of reasonable attorneys' fees and costs of suit to Plaintiff and the Class is appropriate; and

G. Such other and further relief as is necessary and just may be appropriate as well.

310. As a direct and proximate result of Defendant Corizon's and Defendant QCC's actions, Plaintiff and the Class have suffered damages.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff and the Class respectfully requests that this Honorable Court grant the following relief:

A. Injunctive relief to secure access to care necessary to address Plaintiff and the Class's serious medical needs;

B. Injunctive relief to ensure Plaintiff and the Class's rights under the Eighth Amendment are not being violated by these Defendants or their cohorts at the MDOC;

C. Entry of a declaratory judgment stating that Defendants' practices,

acts, and omissions violated Plaintiff and the Class's rights guaranteed to them by the Eighth Amendment;

D. Appointment of an independent medical monitor to oversee Defendant Corizon's and Defendant QCC's activities as a medical provider in the MDOC;

E. Appointment of an independent medical ombudsman to assist and investigate prisoners' claims for medical care, as well as their denials of medical care;

F. Such other relief as this Court may deem appropriate, including costs, interest, and attorneys' fees.

## **<u>JURY DEMAND</u>**

Plaintiff respectfully requests a trial by jury on all matters before the Court to the extent allowed by law.

Respectfully submitted,

EXCOLO LAW, PLLC

By:    */s/Keith L. Altman*
Keith L. Altman (P81703)
Solomon M. Radner (P73653)
Albert J. Asciutto (P82822)
Attorneys for Plaintiff
26700 Lahser Rd, Suite 401
Southfield, MI 48033
(866) 939-2656

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 14, 2019, I served the foregoing document on

Defendants *via* electronic filing:

Dated: May 14, 2019                                 Respectfully Submitted,


                                                    EXCOLO LAW, PLLC
                                                    <u>*/s/ Keith Altman*   </u>
                                                    Keith Altman (P81702)
                                                    Solomon Radner (P73653)
                                                    Ari Kresch (P29593)
                                                    Excolo Law PLLC
                                                    26700 Lahser Road, Suite 401
                                                    Southfield, MI 48033
                                                    (516)456-5885
                                                    kaltman@excololaw.com