# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

Temujin Kensu, #189355

      Plaintiff,

v.

Corizon, Inc., et al.

      Defendants.

Case No: 2:19-cv-10944
District Judge: Mark A. Goldsmith
Magistrate Judge: R. Steven Whalen

| | |
|---|---|
| EXCOLO LAW PLLC<br>Keith Altman (P81702)<br>Attorney for Plaintiff<br>26700 Lahser Road, Suite 401<br>Southfield, MI 48033<br>(866) 939-2656<br>kaltman@excololaw.com | CHAPMAN LAW GROUP<br>Ronald W. Chapman Sr., M.P.A.,<br>LL.M. (P37603)<br>Jonathan C. Lanesky (P59740)<br>Attorneys for Defendants Corizon, Inc. and<br>Quality Correctional Care of Michigan, P.C.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>rchapman@chapmanlawgroup.com<br>jlanesky@chapmanlawgroup.com |

## DEFENDANT CORIZON, INC. AND QUALITY CORRECTIONAL CARE OF MICHIGAN, P.C.'S MOTION FOR SUMMARY JUDGMENT

**EXHIBIT B**    Deposition Transcript of Patricia Schmidt, D.O., dated July 27, 2020

# Transcript of the Testimony of

# **Patricia Ann Schmidt, D.O.**

## **Date:**

July 27, 2020

## **Temujin Kensu v. Corizon, Inc.**

American Reporting, Inc.
Phone:248-559-6750
Fax:248-559-9919
Email:scheduling@american-reporting.com
Internet: american-reporting.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

TEMUJIN KENSU, individually and on

behalf of all others similarly situated,

                                           Case No.:

   Plaintiffs,                             2:19-cv-10944

vs

                                           Honorable

                                           Mark A. Goldsmith

CORIZON, INC., QUALITY CORRECTIONAL

CARE OF MICHIGAN, P.C.,

   Defendant.

_____/

DEPOSITION VIA ZOOM VIDEO CONFERENCE OF:

PATRICIA ANN SCHMIDT, D.O.

DATE:   July 27, 2020

TIME:   10:00 a.m.

Taken in the above-entitled cause, before James A. Hengstebeck,

Certified Electronic Recorder, CER #4623, and Notary Public for

the County of Oakland.

1

Patricia Ann Schmidt, D.O.                Temujin Kensu v. Corizon, Inc.

**2**

APPEARANCES:
KEITH ALTMAN, ESQUIRE
Excolo Law PLLC
26700 Lahser Rd Ste 401
Southfield, MI 48033-2618
Appearing on behalf of the Plaintiffs.
kaltman@lawampmmt.com

JONATHAN C. LANESKY, ESQUIRE
Chapman Law Group
1441 W Long Lake Rd Ste 310
Troy, MI 48098-4476
Appearing on behalf of the Defendants.
jlanesky@chapmanlawgroup.com

Present:
KENNETH McDUFFIE, ESQUIRE
Corizon Corporate Counsel

Briana Ramos

**3**

### I N D E X

WITNESS:                                    PAGE:
PATRICIA ANN SCHMIDT, D.O.
Direct Examination by Mr. Altman          4

EXHIBITS:
Deposition Exhibit Number 1          56
(Notice of deposition)          57
Deposition Exhibit Number 2
(Utilization Management Process in Michigan)

**4**

(Whereupon the parties stipulated to the remote swearing in of the witness by the court reporter.)

PATRICIA ANN SCHMIDT, D.O., a witness herein, after having first been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ALTMAN:

Q. Good morning, Dr. Schmidt. Can you hear me okay?

A. Yes, sir, Mr. Altman, I can hear you.

Q. Okay. How many times have you been deposed in the past?

A. Over the course of my history, probably about five times.

Q. When was the last time you were deposed?

A. I gave testimony two years ago, so the deposition has been probably a lot longer than that and I can't remember.

Q. Okay. I just want to go over a few things before we start. This is not an endurance test. Anytime that you think you need a break, as long as there is no question pending, let us know and we will take a break to meet your needs, okay?

A. Okay.

Q. One of the things that we have to do that is particularly important is you have to use verbal responses. Nods of the head, shakes of the head don't work in a video deposition, okay?

A. Okay.

**5**

Q. One of the things that is going to take some practice is for you to wait for me to finish asking my questions and for me to wait until you finish answering my questions so we get a clean record and the court reporter doesn't get mad at me and normally he could throw something at me if I do this, but he can't at this time. Okay?

A. Okay.

Q. If I ask you a question and you don't understand it, please let me know, okay?

A. I will do that, thank you.

Q. And if you don't tell me that you don't understand a question, I'll assume that you do, okay?

A. Okay.

Q. Now, you understand that today you are not testifying here as yourself. You are testifying here as the face of Corizon, correct?

A. That is correct.

Q. And the answers that you give are not limited to your personal knowledge. They are limited to -- they are what Corizon knows. You understand that, correct?

A. I do.

Q. What did you do to prepare for today's deposition, and when I ask you these questions I want to be very clear, I'm not asking you what you talked about with your lawyer. I'm sure that if you were going to do that he'll stop you,

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

6

but I may ask you who you met with, how long you met with, but I don't want to know, I'm not asking what you talked to your lawyer about, okay?

A.  Okay.

Q.  What did you do to prepare for today's deposition?

A.  I met with attorney Jon Landsky and Ken McDuffie by phone twice. I met with Mason Gill, the VP of operations of the Michigan Corizon contract. I met with Jeff Bomber, Dr. Jeff Bomber, who was the previous state medical director over the phone.

Q.  Okay. Approximately how much time did you spend with your attorneys over the two sessions?

A.  About six hours.

Q.  Okay. Is it Mason with an M?

A.  Mason, M-a-s-o-n is the first name, Gill, G-i-l-l.

Q.  How long did you spend with him?

A.  About an hour.

Q.  And how long did you spend with Dr. Bomber?

A.  It was a phone call and that was about an hour.

Q.  Did you do any -- did you review any materials independently of that on your own?

A.  Yes.

Q.  Okay. What materials did you review independently?

A.  The memo that we crafted, that was crafted that talks about the utilization management. I also met with

7

Scott King in the legal department at Corizon for a phone call that was 30 minutes. That was as far as -- that's it.

Q.  Okay. This memo, do you have that memo in front of you right now?

A.  Yes, I do.

MR. ALTMAN: Jon, is that something I could get emailed to me that I could maybe take a look at on a break?

MR. LANESKY: Yes, we could definitely get that email to you shortly.

MR. ALTMAN: That's fine. I'm not going to ask questions about it now. We'll come back to it later.

Q.  (By Mr. Altman) That memo, when was that memo created?

A.  I can't remember the exact date. I'm thinking that it's this past June that it was put together with Mr. McDuffie.

Q.  And that's June of 2020?

A.  Yes.

Q.  What is your current title at Verizon?

A.  I am currently the state medical director for the Quality Correctional Care of Michigan, P.C.

Q.  Okay. And do you hold any title within Corizon, Inc., itself?

A.  Yes, I do.

Q.  What's that?

8

A.  That would be the transgender specialist.

Q.  And what does that mean?

A.  I work with individuals who are identified with a gender dysphoria and transgenderism and I consult with the other contracts if they have questions about cross-sex final replacement.

Q.  So that's a process for other states, not just Michigan, you were saying?

A.  That's correct, Michigan and other states.

Q.  Who were you employed by, actually employed by?

A.  Quality Correctional Care of Michigan, PC.

Q.  Now, when a physician -- when a healthcare professional sees a prisoner within the MDOC, are they an employee of Corizon or of Quality Correctional Care?

A.  Quality Correctional Care.

Q.  Are any of the PAs or are any of the healthcare professionals employed with Corizon that are treating prisoners at the MDOC?

A.  Would you please rephrase that question? I didn't quite understand that.

Q.  You know, we are going to talk more about the distinction between Corizon and Quality Correctional Care.

A.  Correct.

Q.  The line employees, the people who are physically touching patients --

9

A.  Right.

Q.  -- are they all employees of Quality Correctional Care?

A.  Yes, that are NPs, PAs and physicians.

Q.  NPs, PAs and physicians. Okay. And as I understand it, the actual -- the front-line nurses, they are employees of the MDOC, correct?

A.  That is correct.

Q.  Now, when a healthcare professional makes treatment decisions concerning a prisoner, do they have an attorney sitting with them at that time?

MR. LANESKY: Do you understand the question?

THE WITNESS: No, I don't. I really don't understand your question, Mr. Altman.

Q.  (By Mr. Altman) Okay. When a physician treats a patient at, let's say, Macomb, okay, is there an attorney with them in the room when they are treating the patient?

A.  No, there is not.

Q.  Okay. Do they call an attorney to run their treatment decisions past an attorney?

A.  No.

Q.  So is it fair to say that the employees of Quality Correctional are making their medical decisions independent of any legal interaction, correct?

A.  That would be correct.

Q.  Okay. So then is it fair to say that an employee treating

3 (Pages 6 to 9)

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

10

patients has got to understand their legal obligations in providing that treatment in order to be able to do that?

MR. LANESKY: I'll just object to the form of the question.

THE WITNESS: Would you be able to clarify that question, Mr. Altman? I'm not sure I understand it.

Q. (By Mr. Altman) Okay. The Eighth Amendment of the Constitution, Quality Correctional Care clearly knows of the Eighth Amendment to the Constitution, correct?

A. That is correct.

Q. And with respect to providing healthcare, the Eighth Amendment to the Constitution is the guiding principle sitting on top of all treatment of prisoners, correct?

MR. LANESKY: I'll just object to the foundation. Do you understand?

Q. (By Mr. Altman) Is that correct?

A. I don't. I'm really having a hard time understanding that.

Q. Just for the sake of simplicity, until I ask the differences, can we use Corizon and Quality Correctional Care interchangeably, we understand what we mean?

A. That would be acceptable.

Q. What is Corizon's understanding of its obligations to treat prisoners in compliance with the Eighth Amendment of the Constitution?

11

A. Do no harm and no cruel and unusual punishment.

Q. To do no harm, that's not really Eighth Amendment, that is standard medical care, correct?

A. Correct. That is the overriding principle, though.

Q. Okay. Fair enough. Now, cruel and unusual punishment, what is Corizon's understanding of cruel and unusual punishment in the context of providing medical care?

A. I don't know that we have -- I don't have that answer.

Q. How does Corizon know that it complies with the Eighth Amendment in providing medical care if you don't -- and keep in mind that you are speaking as Corizon now. How does Corizon know that its medical care complies with the Eighth Amendment?

MR. LANESKY: Do you understand the question?

THE WITNESS: I really don't understand the question, Mr. Altman.

Q. (By Mr. Altman) Fair enough. Then let me ask it another way. It's really important stuff. I want to make sure that you understand it so we get good testimony. You said that, you know, the Eighth Amendment said that you can't have cruel and unusual punishment, correct?

A. Correct.

Q. Okay. And what I'm understanding is how does -- what I would like to understand is how does Corizon ensure that its healthcare complies with the Eighth Amendment?

12

MR. LANESKY: Do you understand that?

THE WITNESS: I understand that. I'm just trying to get it to line up so I can give a succinct answer. So I need a couple minutes to think about it.

Q. (By Mr. Altman) No problem. Take your time. This is important. You know, if you need time to think, there's absolutely no problem. I'll give you all the time you want.

A. Okay. Thank you.

MR. LANESKY: Your memo's not going to help you out, but do you understand the question?

Keith, just so I'm clear and I'm not trying to -- it seems like we are getting around 18, the question of number 18, correct?

MR. ALTMAN: To some degree.

MR. LANESKY: To some degree and this is -- and I want to place an objection because I kind of talked about it from a legal standpoint. She's not -- this is one of the questions where she was not prepared to talk about, 18, 19, 22 and 23. This is where -- the way you're wording it is slightly outside of the question, but I definitely think it entails that kind of back-doors into there, so I'm just going to place an objection.

MR. ALTMAN: I hear you, Jon. I'm just going to put it from the perspective, though, I am not really asking

13

from a legal perspective. There is a legal requirement that said you can't have cruel and unusual punishment. How Corizon executes upon that dictate medically is what I'm asking about, and I think that's fair game. I'm not asking her to make a legal conclusion and clearly she testified that doctors are required to make medical decisions independent of lawyers, so the understanding that doctors have of the Eighth Amendment requirement is clearly in focus here from a doctor's perspective.

MR. LANESKY: And that's fine. I just wanted to just make sure we're clear.

MR. ALTMAN: We're clear, we are on the same page.

Q. (By Mr. Altman) And so we are clear, Dr. Schmidt, I'm not asking you as a lawyer. I'm asking you -- you're a doctor. You've been a doctor in the field. You've treated Kensu, who we talked about. Obviously, when you make treatment decisions, the Eighth Amendment has to be in the back of your mind. You know, you obviously have to have a working understanding of the Eighth Amendment. I don't mean like a legal understanding, but a practical understanding in order to provide healthcare and so that's the questions I'm asking you, from that context. If that helps you answer. I'm not trying to -- I'm not trying to get into, like, from a lawyer's perspective, okay. Does that make it a little bit easier for you to answer?

4 (Pages 10 to 13)

Patricia Ann Schmidt, D.O.        Temujin Kensu v. Corizon, Inc.

**14**

MR. LANESKY: I just want to place an objection because I do think it's still outside of the topics that we put forth on the deposition notice. So, you know, just from a practical standpoint, I do believe it's still outside the topics that are presented. Now, even as you are expanding it, I'm listening to her, I do believe that -- now you are talking about, you know, just when you talk about it with Kensu, you talked about her and you're making it now personal. I think it's outside of the topics presented.

MR. ALTMAN: Jon, I only did that as an example to just kind of set the foundation, not specifically her understanding of Kensu, just so we're clear.

MR. LANESKY: Sure. What question, just so we're clear, what question number do you kind of think this falls under?

MR. ALTMAN: Well, I think part of it goes under 17, how healthcare professionals train.

MR. LANESKY: Okay.

MR. ALTMAN: I think under 18, it is under 18 and I think your objection to 18 is as a lawyer but not as a doctor.

MR. LANESKY: Well, I mean, 18 -- if you want to talk about 17, let's talk about how the doctors are trained regarding the Eighth Amendment. Let's talk about that,

**15**

but let's not talk about, you know, now you are talking about how she uses it or how a doctor uses it their differential diagnosis or they how they use it in their workup of a patient. I don't see that as 17, right? I think 17 is how are the doctors trained, right? How did the defendants train the healthcare professionals and if you want to talk about how they're trained, something specific, we could, but I don't see it as how each doctor uses it in the --

MR. ALTMAN: All right. Jon, you made your objections and we can deal with it afterwards.

Q. (By Mr. Altman) Dr. Schmidt, how does the Eighth Amendment -- how does Corizon implement the dictates of the Eighth Amendment in its delivery of medical care at the doctor level?

**A. At the doctor level. So again, Mr. Altman, it really is about how we train and our underlying goal as physicians, nurse practitioners and providers is to do no harm, so that the overarching. If you look at do no harm, that also plays into the Eighth Amendment which is no cruel and unusual punishment, withholding things that are not medically necessary. So our providers are trained to understand that in this special population of corrections. We look to respect and provide the highest quality of healthcare that we are able to do.**

**16**

Q. Now, let's just talk about the do no harm for one second. You'd agree that that's not exactly true. For example, if somebody has cancer and you give them chemotherapy drugs, chemotherapy drugs are going to cause harm at the same time they are hopefully curing the cancer, so do no harm, you know, just on it's face, it's provide more benefit than harm. Is that a better expression of that?

**A. No.**

Q. So in other words, then, if you give somebody who's got cancer a chemotherapy drug that causes them to lose their hair, that's harm, isn't it?

MR. LANESKY: Just objection to the form and the foundation of the question.

MR. ALTMAN: That's fine.

Q. (By Mr. Altman) Isn't that harm when somebody loses their hair because you gave them chemotherapy drugs?

**A. That's an adverse reaction.**

Q. But it's still harm, isn't it?

**A. No.**

Q. That's not harm? It doesn't affect a person? It doesn't cause them any distress?

MR. LANESKY: Object to the foundation. How is she going to know about what each person -- this is not part of this. I don't know where you're going.

MR. ALTMAN: Jon, you know what, it's going to take a

**17**

long time.

MR. LANESKY: I know, but how is she going to --

MR. ALTMAN: Jon, place the objection. Jon, you are not allowed.

MR. LANESKY: Okay. Form and foundation. Form and foundation, Keith. Move on.

MR. ALTMAN: That's fine. I'll ask my question now.

Q. (By Mr. Altman) You've interacted with patients in your time, correct?

**A. Yes.**

Q. When people lose their hair from chemotherapy, do they tend to get upset about that?

MR. LANESKY: Object to the form and the foundation. It's outside the scope of the topics presented in --

MR. ALTMAN: That's a speaking objection, Jon. Come on now. Form or foundation.

Q. (By Mr. Altman) In your experience, does that tend to upset them?

**A. It really depends on the individual.**

Q. So you've met individuals who have no problem, who are happy that they lost their hair from chemotherapy?

MR. LANESKY: Objection, form.

THE WITNESS: We work hard to educate patients about the benefits and the burden of every treatment that we offer. Indeed --

5 (Pages 14 to 17)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

**18**

Q. (By Mr. Altman) Okay.

MR. LANESKY: Let her finish, please.

MR. ALTMAN: I'm sorry. I thought she was done.

THE WITNESS: Indeed, Mr. Altman, there can be issues that appear to be harmful to an individual. Every individual defines that for themselves. It is up to the physician, the provider to give education to the patient about the treatment.

Q. (By Mr. Altman) Understood, and you'd agree that a lot of times there are treatments that have positive and negative effects when you give them, correct?

A. That is correct.

Q. And the goal, though, is to see that the benefits outweigh the burdens, correct?

A. That would be correct.

Q. You wouldn't knowingly give somebody a treatment where the burdens outweighed the benefits, right?

MR. LANESKY: Objection to foundation.

THE WITNESS: With every medical condition, Mr. Altman, for every individual, there may be some treatments that are more burdensome that the patient determines that they want to pursue, so it's very individual. So I cannot make a global statement.

Q. (By Mr. Altman) That wasn't exactly my question. A doctor would not knowingly give a patient a treatment

**19**

where the burdens of the treatment outweighed the benefit, right?

MR. LANESKY: Objection to foundation.

Go ahead, if you can.

THE WITNESS: I don't think I have an answer for that, Mr. Altman.

Q. (By Mr. Altman) Well, can you give me an example of where you would give a treatment to a patient where the burdens outweighed the benefit?

MR. LANESKY: Object to the foundation.

THE WITNESS: As an internist who has practiced palliative care in hospice, from my experience, I don't have an answer to that.

Q. (By Mr. Altman) Okay. Would you personally ever give a treatment to somebody where you knew in advance that the burdens were going to outweigh the benefits?

MR. LANESKY: Just object to the form and the foundation of the question. You're asking for her, now.

MR. ALTMAN: I'm asking her. That's correct.

MR. LANESKY: She is not here about her today.

MR. ALTMAN: Okay, Jon, you made your objection. Come on, let's go.

MR. LANESKY: Keith, you keep --

MR. ALTMAN: Jon, I have to lay some foundation, so stop objecting every single time or we are going to get

**20**

the Judge on the phone. Let's not do this.

MR. LANESKY: Sounds good. Keep going.

MR. ALTMAN: I have a certain amount of time and if I use my time the way I need to use my time, you get to object, I wasted my time.

MR. LANESKY: Move on.

Q. (By Mr. Altman) You can answer, Dr. Schmidt.

A. I am formulating my answer, Mr. Altman.

Q. Okay.

A. So let me repeat the question so I'm answering you. You asked me if there was ever a time that I as a physician would give somebody knowingly a very burdensome treatment.

Q. No, not a burdensome treatment. A treatment where you knew that the burdens of the treatment outweighed the benefits. Not thought, not maybe, you knew in advance.

MR. LANESKY: Same objection, foundation.

THE WITNESS: I don't know that I would have done that. I don't have that information.

Q. (By Mr. Altman) Would that be consistent with Corizon's training of its employees that they should not use treatments where the burden outweighs the benefit?

A. Would you repeat the question one more time for me, please?

Q. You just said that you don't know that -- I'm paraphrasing a little bit -- that you ever provided a treatment where

**21**

the burdens outweighed the benefits. For example, okay, you wouldn't amputate somebody's foot because they had a hangnail, correct?

A. Correct.

Q. That would solve the hangnail problem, but the burden would be far higher than the benefit, right?

A. Correct.

Q. So using that extreme, ridiculous example, and I know that sometimes it's much harder to decide that, would you agree, would Corizon agree that it's policy is not to use treatments where the burden outweighs the benefits knowingly?

A. That's correct.

Q. Now, I'm asking this as Corizon medical. What does the word serious mean in the context of a medical condition?

A. As a broad adjective, that can be used in a lot of different settings.

Q. All right. Maybe we can try to figure out some things that are obviously serious and some things that are obviously not serious. As a general proposition, would you consider a hangnail to be a serious medical condition?

MR. LANESKY: Okay. I'm just going to object to the form and foundation of the question. I already told you before we started this deposition she was not going to be talking about serious medical needs and here we are now

6 (Pages 18 to 21)

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

**Page 22**

talking about it on 18.

MR. ALTMAN: Right, because you talked about it from a legal contact and I am talking about from a medical context. Okay.

Q. (By Mr. Altman) Would a hangnail as a general proposition be considered to be a serious medical condition?

A. **It would be dependent upon the individual and their underlying medical condition.**

Q. When would a hangnail -- give me an example of where a hangnail would be a serious medical condition?

A. **In an uncontrolled diabetic patient who has very poor circulation, the hangnail gets pulled, gets infected and the possibility of gangrene could be there.**

Q. I see. Okay. So we do have some parameters. Would you agree that a medical condition that can lead to death if untreated, that would be serious?

MR. LANESKY: Object to the form and the foundation.

THE WITNESS: Would you repeat the question just a little slower, because I think I missed --

Q. (By Mr. Altman) Okay. Sure. No problem. Would you agree that a medical condition that if untreated could lead to death would be a serious medical condition?

A. **Correct.**

Q. Would you agree that a condition that could lead to a permanent disability would be a serious medical condition?

**Page 23**

MR. LANESKY: Object to the form, foundation.

THE WITNESS: Not necessarily.

Q. (By Mr. Altman) What permanent disabilities would be considered not serious?

MR. LANESKY: Again, foundation.

THE WITNESS: Well, you can have, you know, a stroke and you recover the stroke, but you still have paralysis of the limbs and you are able to adapt and do your ADLs, that's not serious.

Q. (By Mr. Altman) I see. Okay. What about a condition which would require hospitalization, would that be considered serious?

MR. LANESKY: Object to the foundation.

THE WITNESS: It depends on whether it was hospitalization for an elected procedure versus hospitalization due to respiratory failure due to COVID.

Q. (By Mr. Altman) Okay. Would you agree that a hangnail in a nondiabetic person is unlikely to be a serious condition?

A. **I agree.**

Q. Would you agree that cancer is a serious condition?

A. **Not in all cases.**

Q. When is cancer not serious?

A. **When it's found early, early detection.**

Q. But you are presuming it's being treated, correct? Would

**Page 24**

you agree that cancer untreated is a serious condition?

MR. LANESKY: Object to the foundation.

THE WITNESS: It depends on the type of cancer.

Q. (By Mr. Altman) What cancer that would be untreated would be not serious?

A. **Prostate cancer in an older man.**

Q. So it won't have any adverse effects on an older man?

MR. LANESKY: Foundation.

THE WITNESS: Depending on the cell type and its expression, in some cases that prostate cancer will not be detrimental to that individual.

Q. (By Mr. Altman) Even if untreated?

A. **Even if untreated.**

Q. Okay. So what is Corizon's, from a medical perspective, definition of the phrase serious medical need?

MR. LANESKY: Objection, form and foundation. This is literally what we talked about. This is Corizon is talking about a legal standpoint. We are not talking about --

MR. ALTMAN: I didn't ask for a legal standpoint. I asked from a medical standpoint. I asked as a medical doctor. Okay. Strike that.

Q. (By Mr. Altman) You understand that as a medical doctor in a prison setting, medical doctors are required to meet prisoners' serious medical needs, right?

**Page 25**

A. **Correct.**

Q. From a medical perspective. Okay.

What is Corizon's understanding of a serious medical need?

MR. LANESKY: Object to the foundation and the form of the question.

Do you understand the difference he's asking you?

THE WITNESS: No, I really don't understand. We didn't prepare for these, Mr. Altman.

Q. (By Mr. Altman) Well, here's the problem, Dr. Schmidt. You just said that doctors have to treat prisoners' serious medical needs, right? That was your answer to the question before, correct?

A. **Yes.**

Q. Okay. So I asked -- so if doctors have to treat prisoners' serious medical needs, don't they have to know what a serious medical need means in order to know whether they have to treat it or not?

MR. LANESKY: And this is where I'm placing objections to the form and the foundation because you are asking about it from a Corizon standpoint --

MR. ALTMAN: Jon, that is a speaking objection. Form or foundation.

MR. LANESKY: She is not going to answer the question.

7 (Pages 22 to 25)

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.　　　　Temujin Kensu v. Corizon, Inc.

26

MR. ALTMAN: Jon, form or foundation.

MR. LANESKY: She wants to take a break.

MR. ALTMAN: She didn't ask for a break.

MR. LANESKY: She just did. You couldn't hear her when you were yelling at me. She asked for a break.

MR. ALTMAN: I wasn't yelling. You're the one that's yelling, but we will absolutely take a break.

How long do you want? Do you want to take 10?

THE WITNESS: Please.

MR. LANESKY: Perfect.

THE WITNESS: Thank you.

MR. ALTMAN: Okay. No problem.

(Brief recess.)

MR. ALTMAN: James, what was my last question.

(Whereupon the question was read back by the reporter.)

MR. ALTMAN: And there was no answer to that question before the break, correct?

COURT REPORTER: No answer.

Q. (By Mr. Altman) So, Dr. Schmidt, my question still stands and I will note, although I'm not going to push it, but there was a question pending when a break was asked for.

MR. ALTMAN: Are we back on the record, James?

COURT REPORTER: Yes.

Q. (By Mr. Altman) In principle, the discussion that took

27

place is not a privileged communication, but I'm not going to go there and so I'm just going to ask again. What is Corizon's understanding of a serious medical need from a medical perspective?

A. From a medical perspective, a serious medical need is a need that the patient would be seen and be cared for.

Q. I'm not sure I understand. Can you give me an example of a serious medical need?

MR. LANESKY: I'm just going to place an objection to foundation.

THE WITNESS: Serious medical need? Uncontrolled diabetes.

Q. (By Mr. Altman) And can you give an example of a nonserious medical need?

A. That would be a routine annual health screen.

Q. Aside from -- let's put it aside from routine health screening. A prisoner comes to a healthcare professional seeking treatment for something, something specific. Can you give me an example of a nonserious need and the presumption here is, of course, they actually are suffering from whatever it is they say they do, that it's not fabricated. So let's put that aside. Let's assume it's something real. Can you give me an example of a nonserious medical need?

A. No, because every medical need that a patient has would be

28

considered serious for that individual.

Q. Okay. So if a prisoner comes to seek treatment for something and doesn't get treatment for it, that would be -- you would agree, that would not be consistent with treating their serious medical needs, correct?

MR. LANESKY: Just object to the form and foundation of the question.

THE WITNESS: Mr. Altman, it really would depend upon what treatment we are looking at. There are some treatments that are nondrug related, non-surgery interventions that are supportive treatments, but treatment is given, so I think -- treatment is usually given most of the time.

Q. (By Mr. Altman) Okay. So you say most of the time, so when it's not given, clearly that's not meeting a prisoner's serious medical needs, correct?

MR. LANESKY: Just object to the form and foundation of the question.

THE WITNESS: So everything is taken as serious. Everything is reviewed with the patient and the treatment plan is designed for the patient or their condition.

Q. (By Mr. Altman) Would Corizon agree that treating a condition is a graduated iterative process in that you start with the least invasive, easiest burden treatments and graduate as necessary?

29

MR. LANESKY: Object to the foundation.

THE WITNESS: In most cases, that would be correct.

Q. (By Mr. Altman) When would it not be correct?

A. If there was an urgent situation that required a higher level of care.

Q. Okay. Fair enough. Now, Corizon would agree that if there are two treatments available, two treatment options and one is more efficacious than the other, the more efficacious treatment should be used irrespective of cost?

A. Correct.

Q. Would Corizon agree that its policy is to use the least expensive effective treatment in treating a condition?

MR. LANESKY: Object to the form.

THE WITNESS: Mr. Altman, would you rephrase the question?

Q. (By Mr. Altman) Sure. Would Corizon agree that its policy is to use the least expensive effective treatment when treating a prisoner's condition?

MR. LANESKY: Go ahead. Do you understand the question?

THE WITNESS: I do. Correct.

Q. (By Mr. Altman) And there's nothing wrong with that. You don't use a bazooka to kill a fly if you can use a flyswatter, correct?

A. Correct.

8 (Pages 26 to 29)

Patricia Ann Schmidt, D.O.      Temujin Kensu v. Corizon, Inc.

Page 30

Q. That's normal medical practice, correct?

A. **Exactly.**

Q. And Corizon would agree that if there is a tension in that it's paid a certain amount of money to treat prisoners and it wants to provide treatment, the least expensive effective treatment globally, correct?

MR. LANESKY: Object to the form.

THE WITNESS: Mr. Altman, the healthcare we provide is like a managed care system. Corizon is the benefit manager of a managed care system, so you are given a certain amount of money for the population that you serve and so, yes, you would be cost-effective with those dollars so that everyone will be able to get treatment.

Q. (By Mr. Altman) And the less that Corizon pays, the more money Corizon makes, correct?

MR. LANESKY: Object to the form and the foundation of the question.

THE WITNESS: I don't have an answer to that for you, Mr. Altman, because the answers are complex.

Q. (By Mr. Altman) Well, how do you know that the answer is complex if you don't have an answer? And it's not you, it's Corizon. Strike that.

Corizon is paid a fixed amount of money per prisoner, correct?

A. **I don't have that information for you, Mr. Altman.**

Page 31

Q. Okay. Who would you go to to ask that question to if you wanted to know the answer to that question?

A. **To Mason Gill, the vice president of operations.**

Q. Okay. I forget the exact title. You are basically from a physician perspective in charge of the State of Michigan, correct?

A. **My role as the state medical director is to be in charge of the physician coverage and the provider care that we put in from the Corizon contract.**

Q. Do you ever deal with the cost of care for the State of Michigan?

A. **I'm involved with financial meetings with the chief medical officer of Corizon and the vice president of operations on a monthly basis.**

Q. And does Corizon compare how much money it took in for prisoners versus how much went out?

A. **Most of what I see is the monies that we spend on our offsites, our laboratories, our pharmacy and services provided.**

Q. And Corizon doesn't bill the services it provides, correct?

A. **So could I ask for clarification? So when you say bill the services that are provided, are you saying --**

Q. Let me --

A. **-- send an invoice to the State of Michigan?**

Page 32

Q. Let me rephrase that. Fair enough.

Corizon is paid a fixed amount of money per prisoner, correct?

MR. LANESKY: Well, just object to the foundation.

THE WITNESS: Corizon bids the contract to the State of Michigan. In that is a formulation according to the average daily population and there is a certain amount of money that is provided. I don't know if you -- I don't know the formula or anything like that. I know that there is monies from the State of Michigan that are deemed revenue to Corizon. Corizon uses that money to offset the -- through the Quality Correctional healthcare, the payment of the services of the providers and their benefits and then the other monies go toward the offsites, paying for the offsites, the laboratories and any of the other consultations, the imaging, those things.

Q. (By Mr. Altman) And what is the difference between those two is Corizon's profit or loss, right?

MR. LANESKY: Objection to the form.

THE WITNESS: Probably (unintelligible.)

Q. (By Mr. Altman) I'm sorry?

A. **In that milieu, there would probably be the profit or the loss to Corizon.**

Q. Now, are you paid a fixed salary?

A. **Yes.**

Page 33

Q. Do you have any profit sharing at all?

A. **No.**

Q. For your services to Corizon itself, do you get paid extra money for that or is that just part of your job?

A. **That's part of my job.**

Q. Are any of the doctors or nurses or PAs in the state of Michigan paid anything other than a salary?

A. **They get a salary, and it's nurse practitioners.**

Q. Nurse practitioners, sorry. Is there any bonus structure to that?

A. **No.**

Q. Is Corizon a public company, as far as you know?

A. **It got garbled when you asked that question. Would you repeat, please?**

Q. Is Corizon a public company?

A. **No, it is not.**

Q. Do any of the employees get shares in Corizon as part of their employment?

MR. LANESKY: Foundation.

THE WITNESS: I don't have that information. I wouldn't know.

Q. (By Mr. Altman) Well, do you have any shares in Corizon?

A. **I do not.**

Q. What is the relationship between Corizon and Quality Correctional Care of Michigan?

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

34

A. In Michigan, we have to have -- the practice of medicine is governed by the law that says a physician, a PA, a nurse practitioner, may not be directly employed by a corporation. So Michigan -- Quality Correctional Care of Michigan, P.C., is a P.C. that employs the physicians, the nurse practitioners and the PAs so that they can perform the duties of patient care for the Corizon contract.

Q. And who owns Quality Correctional Care?

MR. LANESKY: Do you know?

THE WITNESS: No, I don't know.

MR. LANESKY: There you go.

THE WITNESS: All right. I don't know who owns it.

Q. (By Mr. Altman) Do you know who owns Quality Correctional Care? Remember, this is not limited to you.

A. Right. So Quality Correctional Care is a P.C. that's been set up underneath Corizon for the sole function of employing physicians, providers and nurse practitioners for patient care.

Q. I understand that, but what I'm saying, what I'm trying to understand, is it a subsidiary of Corizon?

A. I'm not certain if it's a subsidiary. I just know that it's a private corporation just for the medical needs, you know, to be able to employ the providers here in the state of Michigan, since that's the Michigan law.

Q. Who is the president of -- I am just going to use QCC.

35

Who is the president of QCC?

A. I am.

Q. Who are the other officers of QCC?

A. Me.

Q. You are the sole officer?

A. I am the sole officer.

Q. How long have you been the president of QCC?

A. September 1st, 2019.

Q. And Dr. Bomber was the president before that?

A. Yes.

Q. Do they have a Board of Directors?

A. No.

Q. So the only executive, board member, everything, is the one and only president, correct?

A. Correct.

Q. What's the corporate structure of Corizon?

A. The corporate structure of Corizon is led by a CEO named Hyman. Chief medical officer currently Pete Powell. There's a finance officer. I can't remember his name. And that has been recently bought by the Flacks Group, which is a private equity group.

Q. Who does the president of QCC report to, which is obviously you right now?

A. To the chief medical officer at Corizon.

Q. Okay. And who is the chief medical officer, again?

36

A. James Pete Powell, P-o-w-e-l-l, M.D.

Q. Okay. Now, where did Mason Gill fit into this?

A. Mason Gill is the vice president of operations for Michigan and he is under Michael Murphy, who was the director of operations, who reports to James Hyman, who is the CEO.

Q. So are you kind of on a lateral to Mason Gill?

A. Yeah, by dotted line.

Q. Now, do you have the authority, do you as the president have the authority to create positions within QCC?

A. No.

Q. Okay. Who has that authority?

A. That would be under operations. They determine the provider needs.

Q. What does the president of QCC actually do? What are your duties?

A. The duties are to ensure that we have well-trained providers to provide healthcare to the prison population.

Q. Is the president responsible for the development of policies and procedures within QCC?

A. QCC doesn't have policies and procedures. We follow the policies and procedures that are, one, laid out by the MDOC and, two, laid out by Corizon.

Q. Who is responsible for seeing that new healthcare providers are trained in those policies?

37

A. We have a formal onboarding process through Corizon and at the Michigan regional office. We have the Corizon University modules that we use. We also onboard through the Michigan Department of Corrections computer-based training and we have Michigan specific training that are usually done either by myself or by one of the other regional medical directors.

Q. Okay. Now, you used the phrase regional medical director. What is that?

A. So under our structure in Michigan, there's the state medical director and under my leadership are three regional medical directors, we divide the state into territories and so the regional medical directors are in charge of review of the providers of the facilities that are in their territory doing appeals and then just being able to work sometimes in the facilities if there's extra support needed.

Q. What are the three regions?

A. Southeast, south and west and north.

Q. Okay. And who are the regional medical directors currently?

A. Stephen Bergman, David Lacey and Jeff Bomber.

Q. And what areas do they cover?

A. Jeff Bomber covers North, Dave Lacey covers Southeast and Steve Bergman covers Southwest and West.

10 (Pages 34 to 37)

Patricia Ann Schmidt, D.O.         Temujin Kensu v. Corizon, Inc.

**38**

Q. Now, I assume the UP is part of North?

A. **Yes, that's correct.**

Q. And is the North just the UP or is part of the northern part of the state south of the UP also included in North?

A. **The only facility south in that region is Manistee in northern lower Michigan. So it's the UP --**

Q. It's confusing. Northern lower Michigan. I've got to get used to all these geographic definitions. Coming from Long Island, it was very different. You had the island, period.

A. **Right.**

Q. Okay. Now, hiring and firing decisions for positions that exist, is that done within QCC or is that a Corizon decision?

MR. LANESKY: Object to the foundation.

Q. (By Mr. Altman) Do you understand my question?

MR. LANESKY: Yeah, I just -- go ahead.

THE WITNESS: You couldn't -- would you rephrase it?

Q. (By Mr. Altman) Sure. You said before that creating positions, that's something that Corizon or operations has to do.

A. **Correct.**

Q. But for positions that exist, does QCC have the ability, somebody in management, your regional medical director, have the ability to fire a healthcare professional?

**39**

A. **Oh, no. It's a combination. It's always between medical and operations. We follow human resource protocol in terms of being able to counsel, correct or terminate.**

Q. Now, does QCC itself have a human resource department or is that all done by Corizon?

A. **All the human resources or done by Corizon.**

Q. Is there any operation of QCC that is unique to QCC and doesn't take place within Corizon, other than the delivery of medical care?

A. **No.**

Q. So is it fair to say that if not for the requirement in Michigan that healthcare professionals have to work for a P.C., that QCC wouldn't exist?

A. **If the law was not present in Michigan, that would be correct.**

Q. Okay. And I assume in other states they don't have the same requirement?

A. **Most states that I know of don't have the same requirement, but I'm not knowledgeable of all the other states that Corizon is in, that background.**

Q. Understood. So in states that don't have the requirement, Corizon directly employs the healthcare professionals and delivers the services, correct?

A. **Correct.**

Q. So for purposes of understanding how healthcare is

**40**

delivered to prisoners within Michigan, QCC itself is essentially irrelevant; is that a fair statement?

MR. LANESKY: Well, object to the form and the foundation of the question.

THE WITNESS: I don't think it's irrelevant. I think it's just part of what -- how we do business in Michigan.

Q. (By Mr. Altman) No, I understand that, but it doesn't fire anybody, correct?

A. **No, not directly.**

Q. It doesn't hire anybody, correct?

A. **That's correct.**

Q. It doesn't have any of its own policies and procedures, correct?

A. **Correct.**

Q. Is it fair to say that QCC doesn't do anything other than employ the medical professionals?

A. **That's correct. QCC just employs the medical professionals.**

Q. Okay. Does QCC maintain any information that is not shared with Corizon?

A. **No.**

Q. Do QCC employees have their own -- do they have email addresses?

A. **The providers have email addresses through the MDOC and also through Corizon Health.**

**41**

Q. Okay. So there is no QCC email addresses, correct?

A. **No QCC emails, that is correct.**

Q. Do you have a laptop when you work?

A. **Yes, it's owned by Corizon.**

Q. Does QCC own any equipment?

A. **No.**

Q. Does QCC store any of its own data on servers other than Corizon?

A. **No, it doesn't have data.**

Q. So is it fair to say that there is no information that is in the possession of QCC that is not also in the possession of Corizon?

A. **Correct.**

Q. As part of delivering services to prisoners in Michigan, the healthcare professionals obviously have access to the prisoners' medical records, correct?

A. **There would be access to the prisoners' medical record, that's correct, to do their work.**

Q. Okay. Does anybody in Corizon who is not an employee of QCC have access to prisoners' medical records?

MR. LANESKY: Can you just repeat that, Keith?

MR. ALTMAN: Sure.

Q. (By Mr. Altman) Like, for example, Mason Gill, does he have the ability to look at patient medical records?

A. **No.**

11 (Pages 38 to 41)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

**42**

Q. Does anybody in Corizon? How about your chief medical officer, could he look at prisoner medical records?

A. Dr. Powell?

Q. Yes. I'm not asking whether he does. I'm asking does he have the ability to?

A. No, because he doesn't have access to COMS.

Q. Who decides who has access to COMS?

A. The MDOC.

Q. Okay. Is there anybody at Corizon who has access to COMS?

A. So just for clarification, Corizon in Brentwood or Corizon in Michigan?

Q. Corizon anywhere. I'm talking about somebody who was employed by Corizon but not an employee of QCC.

A. We have nurses at the Michigan regional office who are employed by Corizon who are case managers, who have access to the records.

Q. So Corizon, is it fair to say that Corizon has access to prisoners' medical records by virtue of its contract with the MDOC and that QCC also as a result would have access to prisoner medical records?

MR. LANESKY: Object to the foundation.

Q. (By Mr. Altman) Do you understand my question?

A. No, I don't. I'm sorry.

Q. Let me ask it differently. QCC does not have a contract with the MDOC, correct?

**43**

A. That is correct.

Q. Corizon has the contract with the MDOC, correct?

A. Right.

Q. As part of the contract with the MDOC, Corizon has access to COMS, correct?

A. Correct.

Q. Corizon decides who gets access to COMS within Corizon, correct?

A. Yes.

Q. Obviously, the QCC folks need to have access to it, correct?

A. Correct.

Q. The nurse case managers need to have access to it, correct?

A. That's correct.

Q. And Corizon could decide with legitimate reason that any particular person should have access to the medical records, correct?

MR. LANESKY: Just object to the form and foundation.

THE WITNESS: If it was deemed necessary, then I suppose that's a possibility, though mostly it's medical --

Q. (By Mr. Altman) Understood, but that's a decision that Corizon could make for the appropriate need, correct?

A. Correct.

**44**

Q. You know, for the purposes of the record for this deposition, that we really don't need to talk about QCC. We could just use Corizon because everything essentially is Corizon; is that fair enough?

MR. LANESKY: Keith, are we talking about Michigan in these questions?

MR. ALTMAN: Yes. Only when I'm talking in the context of Michigan. That's fair.

Q. (By Mr. Altman) When I'm talking in the context of Michigan, I don't have to say QCC for the rest of the deposition. If I just use Corizon, I wouldn't get a different answer than if I use the word QCC, correct, other than who were the employees?

A. That would be correct.

Q. Okay. I'm just trying to make it simpler so we don't have this, you know, this distinction. Okay.

A. Right.

Q. Okay. So with respect to -- QCC has working for it the NPs, PAs and the physicians, correct?

A. Correct.

Q. Are there any administrative personnel that are employed by QCC?

A. No.

Q. Okay. So those would all be employed by Corizon, correct?

A. That's correct.

**45**

Q. Now, within the state of Michigan, how many Corizon employees are there, putting the QCC folks aside? And you can give me an approximate. You don't have to count them up specifically. A ballpark is fine.

A. It's just easier if I use my fingers, Mr. Altman.

Q. That's fine. I just didn't want you to feel compelled that you had to think of every single person.

A. It's enough to fit on two hands, it's just --

Q. No problem. Take your time.

A. About 10.

Q. About 10, okay. I don't need to know names right now, but can you tell me what these 10 people generally do?

A. We have the head, the office manager, who is in charge of the human resources. We have two administrative assistants to her. We have the quality improvement and risk management group, which is two. We have utilization management which is three. Oh, I guess we have 11. We have a case manager for oncology, a case manager for the palliative care and case management for our integrated care program, so that's 11.

Q. Okay. Now, the utilization managers, and we'll be talking more about them, but are they QCC employees or are they Corizon employees?

A. Corizon employees.

Q. Okay. So Dr. Papendick is a Corizon employee?

12 (Pages 42 to 45)

Patricia Ann Schmidt, D.O.                Temujin Kensu v. Corizon, Inc.

46

A. Oh, I wasn't counting him in that number. Yes, Dr. Papendick is a Corizon employee, yes.

Q. And you have Dr. Coleman, also. Is he a Corizon employee or a QCC employee?

A. He would be a QCC employee.

Q. Dr. Coleman, and he is located in Colorado, I think, he is a QCC employee?

A. Right, I think he is still under QCC. Dr. Papendick is under Corizon because he went to the central utilization management department.

Q. Okay. So has his role changed? I'm sure that you are aware that he was deposed in one of the cases a couple years ago. Has his role changed in the last couple of years?

A. No, he is still utilization manager. Where they house him in the corporate structure has changed.

Q. Okay. So before was he a QCC employee?

A. That would've been before my knowledge, Mr. Altman.

Q. Dr. Bomber, I assume was the president before you. He would probably know, correct?

A. That would be correct.

Q. But Dr. Coleman is still a QCC employee?

A. As far as I know.

Q. Now, what is the distinction between Dr. Coleman's area and Dr. Papendick's area?

47

A. Dr. Coleman is our lead for inpatient utilization, ER utilization, with some oversight on pharmacy and durable medical goods. Dr. Papendick --

Q. Okay.

A. Dr. Papendick's role is with utilization management to review requests for the 407 process.

Q. The 407, which we we'll talk more about, but does the 407 process also involve pharmaceuticals or that doesn't go through the 407 process?

A. No, the pharmaceutical process now goes through Pharmacor for nonformularies.

Q. When you say Pharmacor, I'm not sure I understand what you mean.

A. So Corizon has a subsidiary, they have a pharmacy arm to their suite of services and so in this particular contract that Corizon has with the State of Michigan, we were tasked with being able to provide medical care, pharmaceutical care and behavioral healthcare.

Q. Okay. So is this something that's different than the way it was done in the past?

A. This is what's been -- we've had Pharmacor as the pharmacy vendor now since we started our fifth year in May, so go back four years so this is -- so '15 was when Pharmacor came on, the nonformulary process just changed in 2019.

Q. Okay. Now, are there -- does Corizon have policies and

48

procedures that apply to the State of Michigan and the Michigan contract?

A. No, we use the Michigan Department's policies and procedures, we follow what they write.

Q. So are you saying that Corizon has no policies and procedures within the state of Michigan?

A. We have guidelines.

Q. Okay. Guidelines. What's your distinction between a guideline and a policy and a procedure?

A. Well, there's a formal process to writing the policy and procedure that governs how we need to provide care or the thought process behind what would be provided prisoners and actionable items and guidelines are how we inform our providers on how to operate in that system.

Q. The guidelines, are they written?

A. Some may be. I'm not -- we have in the orientation there's things that are written, you know, from the Corizon main that's available, but Michigan doesn't necessarily have specific -- well, excuse me. Let me think on that just a little bit, because I think I'm getting myself confused.

Q. You know what, why don't you put that aside for one second and let me ask some questions that I think will get us there and you'll probably figure it out.

When a new person comes into QCC, a new medical

49

provider, presumably they are already trained as whatever profession that they have, so I'm assuming they are not getting training on how to be a doctor. They are already a doctor. They are already a PA. They are already and NP.

A. Exactly.

Q. They get some kind of training as they become part of the QCC family in providing healthcare to Michigan prisoners, right?

A. Exactly.

Q. Okay. Tell me about that training.

A. So the training, the onboard training is the Michigan-specific things that they get training on is how to write a 407, the consultation process, they get training on how to write for the durable medical goods. They get an entire packet of the Michigan Services Advisory, Medical Services Advisory, guidelines from the MDOC. We have specialty protocols that are written for scabies, for COVID, for influenza, so there is the Michigan-specific information and then there's the Corizon-specific information that talks about PREA, Prisoner Rape Elimination Act. They had safety within corrections. There's a number of tools and modules that they have to go through and pass when they come for their onboarding.

13 (Pages 46 to 49)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

**50**

Q.  Okay.  Now, how long does the onboarding process typically take?

A.  So there's two days within the Michigan regional office, one day for human resource review, how to get them their access to COMS, how to use COMS, getting their initiation into the human resources so they'll get a paycheck and then the other day is all the clinical modules that all go through and then once they get through that, then they go on site and they mentor with a provider who trains them at the bedside -- I mean, in the clinic on how that particular facility works.

Q.  Now, there's one facility, I forget which one it is, that deals with the dialysis patients, which is kind of specialized, but for the most part is the policies and procedures and practices the same, you know, for all the facilities?

A.  There's overarching policies and procedures for every single facility, it's the same, and then with the specialty facilities like Duane Waters Healthcare, Woodland Correction, I think you were referencing Ryan Road, which is --

Q.  Yes, I was.

A.  Those do have additional guidelines for patient care.

Q.  Now, the materials that are given to a trainee coming in, are they written?  Is there a paper that they get?

**51**

A.  No, it's some sort of electronic format, so the format is all electronic.

Q.  Are those materials available to them after the training takes place for review down the road?

A.  Yes.

Q.  So is any QCC person able to sit and go in and see all the materials that they had received in their training?

A.  I think for the most part, if they would want it.  You know, I think it's one of those things that the length may be limited because of that Michigan Regional Office, so if they request the information, they'll be sent it.

Q.  If I said to you, could you please copy all the materials that are used for the training onto a thumb drive, would that be difficult to do?

A.  I'm not really very technical, Mr. Altman, so the volume of information that we provide is pretty extensive, so I don't know whether it would really all fit on a thumb drive.

Q.  Okay.  So aside from capacity, though, just from a -- it wouldn't be difficult to, with the appropriate-sized medium, get a copy of everything, correct?

A.  I think that could be arranged.

Q.  Now, what about -- we talked a little bit earlier about the overriding duty to provide various medical needs, to treat serious medical needs.  What training is provided

**52**

concerning the duties to treat serious medical needs?

A.  So in the onboard --

MR. LANESKY:  You are okay.

THE WITNESS:  Am I?  Okay.  So in the onboarding, we do talk about challenging cases, complex case management and the ability of the provider to reach out to their lead position onsite or to their regional medical director, to myself, if they had questions.

Q.  (By Mr. Altman)  Now, is there any kind of care that a prisoner is not entitled to that they would be able to get if they were on the outside?

MR. LANESKY:  Just object to the foundation.

Q.  (By Mr. Altman)  Do you understand my question?

A.  Well, I mean, I have a specific thought process.  I mean, if you're looking at, like, a transgendered individual who wants surgery, they are not necessarily vetting out the resources to be able to provide that within the MDOC.  That being said, that might be something that we would be less likely to provide where they would have more access to it out in the community.

Q.  Are prisoners entitled to the same healthcare as somebody on the outside?

A.  Oh, my goodness.  The healthcare that we provide within the system is probably -- it meets community standards and in some situations it beats community standards.

**53**

Q.  What is a 407?

A.  A 407 is a term that we use for a provider to submit a request for consultation or a procedure for a prisoner or a patient.

Q.  Now, a 407 is not used, though, when a nonformulary medication is requested?

A.  No, it is not.  Nonformulary medication now goes through a nonformulary medication process through Pharmacor, so with the clinical pharmacist.  If the clinical pharmacists have a question, then they would refer to either Dr. Bradshaw from Behavioral Health Medicines or to Dr. Coleman.

Q.  And you'd agree that once a prisoner has been approved for a specific nonformulary treatment and if that treatment -- Strike that.  I want to make sure I'm asking Corizon.

Corizon would agree that once a prisoner is approved for nonformulary treatment, if it turns out that that treatment is effective, it would be inappropriate to simply discontinue that treatment?

MR. LANESKY:  Object to the form and the foundation.

THE WITNESS:  So with a treatment that's efficacious for a prisoner, it undergoes review.  For example, Dr. Hutchinson, who is our HIV specialist has recognized that there are certain medications that may be better utilized in a different fashion, so instead of, you know,

14 (Pages 50 to 53)

Patricia Ann Schmidt, D.O.　　　　　Temujin Kensu v. Corizon, Inc.

54

a specific branded name medication, if there is a generic medication for HIV treatment that's as effective as the brand names, that there would be education of the prisoner and transitioned to the generic medication. So we do look at being able to provide, as you mentioned earlier, cost effective healthcare to all the prisoners.

Q. (By Mr. Altman) Fair enough, but you wouldn't simply stop their HIV medication, correct?

A. No, we wouldn't stop it.

Q. That would be inappropriate to do, right?

A. Correct.

Q. Is it fair to say that the prisoner is supposed to be part of that process when something like that is going to happen, if they want to transition to a generic or some slightly different treatment?

A. It's very important that the provider would give education to the prisoner before there would be any change.

Q. Is another example of this kind of thing with respect to macular degeneration treatments, the eyes and using things like Eylea versus Avastin, which has about a 40 times difference in cost? Is that the same kind of thing?

MR. LANESKY: Object to foundation.

THE WITNESS: Mr. Altman, I am not prepared to answer that question.

Q. (By Mr. Altman) So the 407s. Tell me how the 407 process

55

works. Let me just ask a question before. We've got a long way to go, so the question is, is what time do you want to take a break for lunch and for how long and we are going to go by what you want, Dr. Schmidt, but we are not going to finish before lunchtime. That, I can tell you.

A. Okay.

MR. LANESKY: And we'll have lunch brought here. We can order some food and bring it in here. Just the question is when do you want to take a break? He's asking, you know, do you have a preferred time? We are going on 20 to 12:00, so do you want to --

THE WITNESS: So go to 12:00 and take about a 30-minute break?

MR. LANESKY: Yeah, we'll probably need a little more time to get the food up here.

MR. ALTMAN: Do you want to take, like, a five-minute break now, order your food and then we can break when the food comes? However you want to do it, Jon.

MR. LANESKY: That's fine.

MR. ALTMAN: Whatever is convenient for Dr. Schmidt.

MR. LANESKY: Yeah, let's take a quick five-minute break and we'll order something and then we will go until the food shows up.

MR. ALTMAN: Okay, perfect.

///

56

(Brief recess, whereupon Ms. Ramos left the deposition.)

Q. (By Mr. Altman) So we talked a little bit about the 407 process. Now, you know, let's just clean one thing up.

MR. ALTMAN: I'm going to mark as Exhibit 1 for this deposition and, Jon, I would like to use universal numbering for our depositions, so literally, this will be the Exhibit 1 for all depositions in the future, but probably never used again. It's going to be the deposition notice in this case.

Q. (By Mr. Altman) Which, Dr. Schmidt, you did see the deposition notice, correct?

MR. LANESKY: She's got it right in front of her.

THE WITNESS: A copy of it.

MR. ALTMAN: Okay. Perfect. So that is going to be Exhibit 1.

(Whereupon Deposition Exhibit Number 1 was marked for identification.)

MR. ALTMAN: And then I'm going to mark as Exhibit 2, which I'm going to forward to James right now, is the memo that Jon sent to me. You didn't forward it to James also, did you?

MR. LANESKY: No, I apologize.

MR. ALTMAN: That's no problem. I'm going to forward it to him right now.

57

MR. ALTMAN: James, we are going to mark this memo as Exhibit 2.

(Whereupon Deposition Exhibit Number 2 was marked for identification.)

Q. (By Mr. Altman) Dr. Schmidt, I assume you have that memo in front of you, as well?

A. I do.

Q. So Exhibit 2, who wrote that?

A. That was a collaborative writing with myself and Ken McDuffie.

Q. Okay. What did you refer to in writing that document?

A. I was the one who spoke the process and Ken took the notes and put it in this format.

Q. Did you refer to any written policies or procedures or guidelines in drafting this document?

A. What was used was the training, the training module we have for the Michigan-specific process of onboarding individuals on 407 as well as there's some updated draft documents for the appeals process.

Q. When you say updated draft documents, what does that mean?

A. That's in collaboration with the MDOC, since we are now using COMS. There's some process changes that are going to be implemented later. That's why it still under wrap. It's regarding how counsel communicate with the regional medical directors directly, so that the provider doesn't

15 (Pages 54 to 57)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

58

have to do an email.

Q. Now, in terms of procedures, that's Dr. Papendick, correct?

A. When you ask in terms of procedures, are you asking that it's, like, procedures done to the patient versus policies and procedures, correct?

Q. No, I mean -- I meant procedures for the patients, not policies and procedures. I'm sorry. Let me take a step back. I just want to make sure I understand the distinction between Dr. Coleman and Dr. Papendick. If somebody wants a specific, you know, to go see a specialist or something like that, that's a Dr. Papendick call, correct?

A. No, Dr. Papendick covers consultations, imaging requests and any form of, like, surgical procedure or procedure that would be done onto the patient, that is correct.

Q. And Dr. Coleman, what's his area?

A. So his area is durable medical goods, so if somebody went -- Dr. Papendick said that they would go to orthotics and orthotics say they need an inset, then it would go back to Dr. Coleman to make sure that that was noted in the record as approved, because that inset would need to be identified in the record so that it would be a detail for the patient. So they work somewhat in tandem, but separately. So durable medical goods -- the main role of

59

Dr. Coleman is inpatient utilization, emergency room utilization, the support for nonformulary medications, if there is a question and for durable medical goods.

Q. Okay. Now, and I'm asking this just so we can give some context. Have you ever been involved in clinical trials at all in your years as a doctor?

A. Yes, I was.

Q. Okay. Now, when a treatment gets approved or becomes the standard of care, it's basically by looking at the weight of scientific evidence, that it appears that the benefits outweigh the risks and more people appear to be benefitted than not benefitted, comparing to some placebo, as a general proposition, right?

A. As a general proposition, that's correct.

Q. Now, the statistics overall don't necessarily tell you about an individual patient, correct?

MR. LANESKY: I'll just object to the foundation.

THE WITNESS: No, they wouldn't tell you about the individual patient. They look in total.

Q. (By Mr. Altman) Now, you'd agree that there have been drugs which have been approved for which for some patients, the drug didn't work, right?

MR. LANESKY: Same objection, foundation.

THE WITNESS: That is correct, because of idiosyncratic differences of the individual to the

60

medication.

Q. (By Mr. Altman) We can call that biological variability; is that a fair statement? People are different?

A. People are different.

Q. And it may be that people like, what is it, P450, that some people poor metabolize certain drugs and can have different effects of different drugs that don't work with the P450 system, right?

A. Right.

MR. LANESKY: Objection --

THE WITNESS: That would be correct. P450 is quite a broad system, though, Mr. Altman.

Q. (By Mr. Altman) I understand, but I'm just saying there are some drugs that if you have certain deficiencies or whatever, you can have a wildly different experience with the drug than somebody who doesn't, right?

MR. LANESKY: Form and foundation.

THE WITNESS: Correct.

Q. (By Mr. Altman) So you would agree that or Corizon would agree that sometimes the statistics don't tell you whether a particular treatment will work or not work for a given individual, right?

MR. LANESKY: Object to the form.

THE WITNESS: Would you repeat the question in a little different way, Mr. Altman? I'm just struggling to

61

answer it properly.

Q. (By Mr. Altman) Corizon would agree that even though a specific treatment overall works because it's been either kind of the standard of care, it's been approved as a pharmacologic treatment, does not necessarily mean that it's going to work for a particular individual, correct?

A. That would be correct.

Q. Corizon would also agree that -- I mean, taking behavioral health, for example, it's very difficult to know exactly the right drug to use on a given individual to achieve the best results or combination of drugs, correct?

A. That can be a challenge to that field of medicine, correct.

Q. And it sometimes requires a bit of trial and error to find the best drugs and the best combination of drugs that work for somebody, correct?

A. That would be correct.

Q. What is Corizon's understanding of off-label usage of a drug?

A. We don't usually use off-label. Where, basically, the care that we provide, the individuals have to follow evidence-based practice models, so we are very strong on using the evidence-based models. So using off-label usage, though we will, we do use off-label, especially within the transgender population, because you're using

16 (Pages 58 to 61)

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.　　　　　　Temujin Kensu v. Corizon, Inc.

**62**

cross-sex hormones for transition from one gender to the other is considered off-label, that requires an extreme amount of information and consent from the patient to understand what that is about. For the most part, unless there is strong evidence to support it, that's not necessarily used.

Q. Sure, but let's take, for example, the use of anticonvulsants in certain pain conditions. For example, gabapentin. Gabapentin is mostly used off-label and not procedure controlled, correct?

A. There's a now indication for neuropathic pain with gabapentin.

Q. Okay, but not for diabetic peripheral neuropathy, correct?

A. That is a neuropathic pain syndrome, Mr. Altman.

Q. I know, but they are separate conditions requiring separate approvals; isn't that true?

MR. LANESKY: Just object to the foundation.

THE WITNESS: Okay. Let's rewind this back. So you said, the way I heard the question, is that the use of an anticonvulsant, gabapentin, is off-label use for pain.

Q. (By Mr. Altman) I didn't say pain. I didn't say pain generally.

A. You didn't say pain generally. Okay.

Q. Well, I said it has been used off-label for pain for certain various different kinds of pain. You said it's

**63**

gotten approval for neuropathic pain.

A. Neuropathic pain, yes.

Q. But diabetic peripheral neuropathy is considered -- how about postherpetic neuralgia, those are considered separate indications, aren't they?

A. They are under neuropathic pain, though.

Q. Well, I understand that, but -- all right, so your position is neuropathic pain covers everything?

A. I am at this point, yes.

Q. Okay. How long have you been in prison medicine?

A. Six years.

Q. Six years, okay. Gabapentin was used heavily before that neuropathic pain indication for pain conditions, wasn't it?

A. In the community, it was.

Q. And so before they got the approval for neuropathic pain, would it have been allowed to use gabapentin? Would they have been allowed to use gabapentin in the prison system to treat pain, if it had been used heavily in the community?

MR. LANESKY: Foundation.

THE WITNESS: Usually, medications such as that, that are essentially acting, would go through the pain management committee.

Q. (By Mr. Altman) Okay. Under what conditions is a Corizon

**64**

healthcare professional allowed to use a drug off-label?

A. They're not.

Q. So you're saying there is an absolute prohibition to use of a drug off-label within the MDOC, other than you talked about the transgender situation?

A. And that has a special group that governs it. So anytime there's a medication that would be considered an off-label use, there's usually a governing board that looks at it really -- we really, really strongly make certain that our providers are using medications according to the recommendations and not use them off-label. I cannot think of any specific examples, though there probably have been some instances, you know, behavioral health or in medical where someone has written for something that's not necessarily off-label, but not within their purview to write. So the use of a behavioral health med written by a medical provider or a medical -- a medication written by behavioral health. So those meds are on formulary, but they are not -- they are not considered off-label. They're just considered in the wheelhouse of those providers.

Q. I see. Okay. Now, this procedure with the 407s, and you say it's changed, that it's under revision. When did it change?

A. It's been refined. The process is still the same. The

**65**

provider submits a request, it goes to the utilization management team, it's reviewed. It's either accepted or an alternate treatment plan is given. The only thing that's changing is in the process with COMS as the communication, there are going to be areas where there is a drop-down menu that says accept or appeal and then it can be pushed to the next level for review. So that's a refinement. It's not a --

Q. Got you. How many utilization managers are there within -- overseeing the care of patients in the MDOC?

A. So when you say utilization managers, are you referring to the physician reviewers or are you referring to the whole department?

Q. Let's talk about the physician reviewers.

A. All right. So for the Michigan contract, we have Dr. Keith Papendick, who is the primary and full-time reviewer and then we have two ancillary reviewers, Dr. Shelby Stacey and Dr. Vivian Dorsey.

Q. Okay. You also have Dr. Coleman dealing with his area, correct?

A. Yes, and then there's Dr. Coleman for inpatient utilization, emergency room utilization, durable medical goods and the complex nonformulary.

Q. Okay. Is there anybody with him or is he by himself on that area?

17 (Pages 62 to 65)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

66

A. He has four -- Dr. Coleman, he works with two nurse case managers for inpatient utilization.

Q. Okay. And how many case managers are there on Dr. Papendick's site?

A. One.

Q. Now, how long has it been that Dr. Papendick has these two auxiliary physicians working with him?

A. So, in my experience, coming on as the state medical director, so when I was the RMD for the North, it was during that period and I was the RMD for the North from 2017 until 2019, so in that two-year period, that I know of. I don't -- I don't know prior to coming into board leadership at Corizon.

Q. I understand that, but I asked you how long has he had these two auxiliary physicians?

A. So my answer would be, I don't know.

Q. Okay. Were they there when you started in 2017?

A. That's what I said, yes.

Q. Bear with me a second, if you could.

A. All the time you need, Mr. Altman. All the time you need.

Q. Thank you. Now, I am a little bit confused because I took Dr. Papendick's deposition back in March of 2019 and when I took his deposition he didn't mention anything -- what was the name of those two physicians that you say assist him?

67

A. Dr. Stacey and Dr. Dorsey.

Q. I'm sorry. Can you say that one more time?

A. Stacey, Dr. Stacey is the last name.

Q. S-t-a-c-e-y?

A. Yes, S-t-a-c-e-y. Dorsey, D-o-r-s-e-y.

Q. And what's the other doctor?

A. Dr. Vivian Dorsey, D-o-r-s-e-y.

Q. Okay. Were you aware that Dr. Papendick said that he reviewed a hundred 407s a day?

MR. LANESKY: Object to the foundation.

Q. (By Mr. Altman) Back in 2019.

A. I did not know that. I know he reviews a lot.

Q. Now, he says it was taking him 10 hours a day, which is, let's say, 10 per hour, is like six minutes apiece, but does it seem -- I don't know. To me, it seems to review a hundred, try to review a hundred 407s a day seems like an awful lot of work for one person. Would you agree?

MR. LANESKY: Just object to the foundation.

THE WITNESS: It would sound a lot to me, but I am not a reviewer.

Q. (By Mr. Altman) Do you have any reason to believe that Dr. Papendick wasn't accurate when he said he was reviewing about a hundred today?

A. I would trust whatever Dr. Papendick said that he does.

Q. Okay. How many cases does Dr. Papendick review today a

68

day?

A. How many does he review now? The number a day. The numbers have decreased because we don't have that many 407s being submitted because of the COVID.

Q. Okay, but before COVID happened, about how many per day was he looking at?

A. I don't have a good answer for that, Mr. Altman.

Q. Is that something that the president of QCC would be -- that would fall under your purview?

A. Under my purview is I know how many 407s are submitted a month. How many are submitted monthly.

Q. Okay. How many 407s are submitted a month today? You know, pre-COVID.

A. Pre-COVID was about 1200. 1200 in a month.

Q. 1200 in a month. And how long was that? Was that increasing, decreasing?

A. Well, there's an increase in the number of 407s we were seeing the six months prior to COVID.

Q. So the 1200 a month, is that with the increase or is that pretty much a steady thing?

A. That would be pretty much an average of that six-month window.

Q. Now, if there's an appeal, you know, that requires that the on-the-ground healthcare professional needs to do the appeal, correct?

69

A. So in order to do an appeal, the provider would then reach out to their lead physician to discuss and then they would move it up the chain to the regional medical director. They notify the regional medical director that they want the appeal. The regional medical director reviews the chart, goes into another module called CARES, which is how Corizon at the national level monitors what we are doing for 407s and submits a 407 appeal. The appeal is then reviewed by two independent reviewers. So if Dr. Papendick was the original reviewer, then this would be reviewed by Dr. Stacey and Dr. Dorsey, reviewing the regional medical director's input on the appeal for the 407.

Q. How many appeals take place in a month? You have 1200 407s. How many appeals take place?

A. So our ATP rate is about 12 percent, so whatever 12 percent -- so probably about 100, maybe. Well, no, 12 percent.

Q. So you're saying 88 percent of the requests get approved?

A. Yes.

Q. So CARES, as I understand it, is a database that maintains the statistics on the 407s?

A. So CARES is the module, the database that is used to, one, create the authorization numbers needed so that the procedures can go through and be paid to the consultants

18 (Pages 66 to 69)

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                                Temujin Kensu v. Corizon, Inc.

70

or to the facilities doing the procedures, so that's, it's like -- to my mind, it's like an insurance. You send it and out of that we can pull our 407 data.

Q. So are all the 407s that are done, even if they are approved, they are in CARES, as well, correct?

A. Yes, everything is in CARES.

Q. So the bottom line is, if I said to you, I would like to see a list of all the 407s that took place in 2019, presumably you could go to CARES and get that data, right?

A. I could ask someone at the corporate office, yes, to pull that data for me.

Q. Have you ever had to pull, you know, a collection of 407s for that purpose? When I say you, I mean, I'm assuming that you are not sitting at the keyboard doing it, but have you ever in your capacity asked somebody to get you that data?

A. Yes, we have been asked to get the data on the 407s because we have a certain backlog due to COVID, so we have to know where we are, what's pending and what's been performed. So we've been looking at it pretty closely over the last several months.

Q. There's no ability for a patient to appeal a decision, correct?

A. So in the doctor-patient or in the provider-patient relationship, after a 407 has been given an alternate

71

treatment plan, it is strongly encouraged and recommended that the provider then meet with the patient to review the alternate treatment plan for the individual. At that point, the patient could tell the provider that they are not in agreement with it, and at that point the provider could review with their physician or with their regional medical director to determine the next step of care with that.

Q. Understood, but the prisoners themselves do not have the ability to appeal it themselves. It is dependent upon their health professional, correct?

A. Right, it would be the provider would be the one submitting the appeal.

MR. ALTMAN: Okay. Looks like your food came. Do we want to break now?

MR. LANESKY: Yeah, I was about to say the same thing. Let's just take a 30-minute break.

MR. ALTMAN: Why don't we just make it an even 1:00 o'clock. It looks like it's about 12:20 now. Let's just make it a straight 1:00 o'clock.

MR. LANESKY: Sounds great. Let's do that.

THE WITNESS: Wonderful.

MR. ALTMAN: Okay. See you at 1:00 o'clock.

THE WITNESS: Thank you.

(Lunch recess.)

72

Q. (By Mr. Altman) Dr. Schmidt, before lunch I asked you and you said there was about 1200 407s a month. Now, does that combine those that go to Dr. Coleman and those that go to Dr. Papendick?

A. No, that's only the ones that go to the utilization management.

Q. Got you. Okay. Now, you said about 12 percent were appealed, right?

A. Or are ATP, 12 percent alternate treatment plan given.

Q. Okay. So you are saying 88 percent of those requests were approved as-is?

A. Yes.

Q. That's interesting. Now, are there some prisoners within the MDOC system that internally command special attention, as opposed to other prisoners?

MR. LANESKY: I'll just object to the form and the foundation of the question. Where are we going with this, just out of curiosity, with these questions, Keith?

MR. ALTMAN: I just asked if there are prisoners that there is special monitoring of their medical condition.

THE WITNESS: There are some prisoners, Mr. Altman, that you have what we call case management.

Q. (By Mr. Altman) Okay.

A. Most of the facilities have a case management process, which is multidisciplinary, so it's the provider nurses,

73

it's custody, behavioral health. So we do have that process.

Q. Now, are there -- is there any kind of centralized discussions about these prisoners that have case managements?

A. Help me understand the question, please.

Q. Well, let me be specific, just so we understand. You obviously know Kensu. He is the named plaintiff in this case. Does Kensu have a case manager?

A. A case manager? I would say not a case manager. There is a complex case management on him once a month.

Q. Okay. What does that mean?

A. That means that the MDOC leadership, Dr. McIntyre, Dr. Blessman, Dr. Hussein, myself, Dr. Lacey, the provider at Macomb, the regional director of nursing meet to review his case and his medical needs and accommodations.

Q. How many prisoners at the MDOC have that kind of attention?

A. There may be more. I am not privileged to know that information. I just know Kensu's case.

Q. How could you not know that, you are the state medical director. Are you involved in any other similar meetings concerning any other prisoners?

A. No.

Q. So Kensu is unique in that regard?

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

---

**74**

A.  I guess you would say that.

Q.  Are there records of that meeting kept?

A.  Yes.  The notations of the meeting is put into his medical record.

Q.  So if we were to look in his record, we are going to see specifically that every month we're going to see a notation from this committee and what was discussed and what was decided?

A.  Yes.

Q.  And how long has this been going on for?

A.  At least since September of 2019.

Q.  Now, for a while, you were Kensu's primary treater, correct?

A.  I was -- as the regional medical director, I covered over Macomb Correctional for a period of time and was assigned -- Mr. Kensu was assigned to my patient panel.

Q.  Were you ever involved in any meetings like this before 2019?

A.  The complex case management?

Q.  Like what Kensu has.

A.  Well, I was involved with case management at the facility level.

Q.  I understand.  I'm trying to understand what is done for Kensu here appears to be unique and it started in September and I'm trying to understand, did it start in

---

**75**

September -- well, strike that.  Were you the one that decided that this should take place?

A.  No, the MDOC did.

Q.  The MDOC.  Now, if it was occurring before that time, you would've been involved in it as his treater and also the regional medical director, right?

A.  I would hope that I would've been involved with it, yes.

Q.  Okay.  So the fact that you weren't involved in it, does that suggest that it wasn't taking place like this before September 2019?

A.  That would be correct.  It wouldn't have been taking place in the context that we have now.

Q.  Why was it initiated in September 2019?

MR. LANESKY:  Object to the foundation.

Go ahead.

Q.  (By Mr. Altman)  Strike that.

Does Corizon know why it was initiated in September 2019?

A.  No, I don't have a good answer for that, Mr. Altman.

Q.  So did the MDOC just come in one day and say that we are going to start having these meetings?

A.  Yes, that's the way I remember it.

Q.  And there is no other prisoner in the entire MDOC system that has this automatically?

A.  Not to this extent.  There are certain prisoners that do

---

**76**

have intensive attention from the MDOC on a more -- on a detailed level.  That doesn't include Corizon.

Q.  The new treatments for hep C, they are very expensive, aren't they?

A.  The direct-acting cancer virals are costly.

Q.  Are there any alternatives to those that work?

A.  Well, right now the State of Michigan has really pushed forward an agenda that all prisoners within the MDOC are treated for hep C, so --

Q.  And when did that initiative start?

A.  Within the past year.

Q.  To this day, are there any alternative treatments?  I mean, I know that there were a couple of different of these antivirals, but aside from these new antivirals, was there any alternative treatments to hep C other than treating, you know, the symptoms, treating it symptomatically?

A.  So if you are looking historically, Mr. Altman, at hepatitis C, many years ago the treatment was with interferon and an antiviral.  They found that that had benefit and burden and they were very selective with the cases that they would choose because of just the challenge of that treatment.  With the direct antivirals, because there's a number of them available and there's different price points within them and the treatment for different

---

**77**

genotypes, we are able to provide the treatment for hepatitis C.

Q.  Dr. Papendick, what kind of doctor is he?  And I don't mean a D.O. versus an M.D.  Do you know what his specialty is, if he has one?

A.  I know he's told me and I can't remember right now exactly what his specialty is.

Q.  Is he an orthopedist?

A.  I don't know.  I can't remember.

Q.  I'll see if I can find the answer for that.  Bear with me a second, please.

Now, as a general proposition, would Corizon agree that a specialist is likely to know more about specific treatments then a generalist, with respect to medical treatments?

A.  A specialist, by nature of their training, has a more limited specific knowledge of a type of condition that they are specializing in.  If they are a cardiologist, they would have a deeper understanding of everything in regards to cardiology.

Q.  Now, if there's a dispute between a specialist and a generalist, who generally should win that battle in terms of a plan of treatment?

MR. LANESKY:  I'm just going to object to the form and foundation.

---

20 (Pages 74 to 77)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

78

THE WITNESS: When you are looking at recommendations from a specialist, you have to weigh what they are saying with the evidence that you have available to you. Some specialists do not understand certain environments that we treat people in, what the formulary is. So it's very important for the provider or the generalist to weigh out what the specialist is recommending.

Q. (By Mr. Altman) Now, if a specialist recommends a treatment that is more efficacious than what's on the formulary, the patient is supposed to get what the specialist recommends, right?

MR. LANESKY: Object to foundation.

THE WITNESS: Not necessarily.

Q. (By Mr. Altman) Well, you said earlier that a patient should get the most efficacious treatments available, correct?

A. Efficacious treatment, yes.

Q. Okay. So if a specialist recommends one treatment that is more efficacious than what's on the formulary, why would the specialist -- why wouldn't the patient get what the specialist recommends?

A. So if you are talking about an efficacious treatment that's a nonformulary, then it has to go through the nonformulary process. That's where I'm looking at where it might be different.

79

Q. I'm still trying to understand that. So the person who is reviewing the specialist is not a specialist generally, right?

A. That's correct.

Q. Okay. Why wouldn't the specialist be deferred to?

MR. LANESKY: Asked and answered.

Go ahead. Answer it.

THE WITNESS: I can answer?

MR. LANESKY: Yeah, if you can.

THE WITNESS: Just because a specialist recommends something, if it's not within the scope of what we have in our environment in corrections, it's not necessarily going to be followed. There are certain things that we have to look at in corrections that are different than what you look at in the community. In the community, if a brace is recommended, if medication is recommended, it goes to the insurance company to determine it. Within corrections, we have to look at all the different aspects of what the recommendation is and how it's going to apply to this prisoner patient.

Q. (By Mr. Altman) Still, none of that seems to have anything to do with efficacy.

MR. LANESKY: Is there a question? I mean --

Q. (By Mr. Altman) I'm still trying to understand. If a specialist says a prisoner needs a certain treatment,

80

under what circumstances would the prisoner not get that treatment and why?

A. So in the setting of corrections, there are times that -- okay. I'll answer with an example. I have a male-to-female prisoner who needs a surgery. Go to the surgeon who says we can do this surgery. Will we follow-up with that surgery? Probably not, until we make sure that we have everything in line for that prisoner for the postop period, understanding the consequences of the procedure. So for other prisoners a specialist may recommend an intervention and unless we have everything all lined up to understand what's going to happen postop or with that intervention that they've recommended, we may wait to initiate that.

Q. You would agree that the healthcare professional who lays their hands on the patient is probably the person who knows the most about the patient, as opposed to somebody who's just looking at some medical records somewhere, correct?

A. That would be correct.

Q. If the doctor laying hands on the patient says that this person needs to have an evaluation by a specialist to determine what's going on, when would it be appropriate to override that request of the hands-on professional?

A. So let me see if I understand your question, because I'm

81

not completely getting all of it. If the person -- say, I am the provider, I see the patient. I make a determination about what the patient needs, then I would request a consultation. Is that what you are suggesting?

Q. Correct. And under what circumstances would it be appropriate for the patient not to have that consultation?

A. If there was a determination that a conservative measure may be needed to really assess and ascertain the extent of the condition. Sometimes a trial of conservative treatment. So I would see somebody and determine perhaps they need to see an endocrinologist, yet I had not as an internist taken the therapy as far as I could take it, I would need to take the therapy as far as I could take it and then if it wasn't working, suggest the patient see an endocrinologist.

Q. And how long should that go on for before somebody should get to see -- get a consult?

A. I would hope that there would be close follow-up in that it could be weeks to months before they would see the specialist.

Q. Should it be years?

A. It could be years.

Q. Should it be years?

A. Should it be years? I don't -- it depends on the condition, Mr. Altman.

21 (Pages 78 to 81)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

**82**

Q. Where would it be appropriate for a recurring condition that is continuously complained of and for which the treater requested a consult be ignored and not have the consult?

MR. LANESKY: I'm just going to object to the form and the foundation.

MR. ALTMAN: Strike it. Terrible question.

Q. (By Mr. Altman) I'm going to use a real-world example because it's just easier. Okay. You know Mr. Kensu?

A. Yes, sir.

Q. Mr. Kensu has been complaining about his shoulder for years. He complained about it, he had a lawsuit, which I'm sure that you are aware of, and in 2016 it was concluded that the treatment of his shoulder was done with deliberate indifference or the lack thereof. In the four years since that verdict, Mr. Kensu has still not had -- seen an orthopedist for his shoulder. Is that appropriate? And continues to complain of it all the time.

MR. LANESKY: I'm just going to object the foundation of the question, but if you can answer that, go ahead.

THE WITNESS: I think, Mr. Altman, that there has been follow-up for Mr. Kensu with this.

Q. (By Mr. Altman) Has Mr. Kensu seen an orthopedist?

A. I don't have his record in front of me to cite why it

**83**

burst. That being said, there has been some follow-up on his specialist appointments.

Q. If Mr. Kensu has not seen an orthopedist four years later, is that appropriate?

MR. LANESKY: Object to the foundation.

THE WITNESS: I would think that they would need to be seen.

Q. (By Mr. Altman) And if his healthcare professional has asked multiple times for him to see an orthopedist, is it appropriate that their requests were ignored?

MR. LANESKY: Well, I'm just going to object. Let me just say this, if we are going to talk about the real world, Keith, I mean, do you want to switch in the real people? Do you want to talk about it specifically or are we still in that hypothetical? I'm just kind of --

MR. ALTMAN: Well, I'm trying to use a real-world example so that we can --

MR. LANESKY: No, I know that.

MR. ALTMAN: Wait, wait, Jon. Let me finish speaking. Okay. Because one of the issues that here and it was specifically cited by the Judge is the McKissick testimony and so I'm trying to understand specifically with respect to orthopedics that McKissick -- well, let me take a step back.

Q. (By Mr. Altman) You are aware that Ms. McKissick

**84**

testified, and you know who that is, Marion McKissick, right?

A. Yes, sir.

Q. She testified that 90 to 99 percent of her requests for an orthopedic consult were denied. Were you aware that she testified to that?

A. I didn't know what her testimony was, Mr. Altman.

Q. You never heard that before today?

A. No, I have not.

Q. That would appear to be inconsistent with your testimony that says 88 percent are approved, right?

A. Right, that's correct. 88 percent are approved.

Q. Okay. So we have this inconsistency here that somehow we are going to have to resolve this because 90 to 99 percent are not approved. That's a very big difference, wouldn't you agree, between 88 percent being approved?

A. Right, and the answer, you need to take into consideration that I'm speaking for Corizon and I have the data to support what it is that I'm saying.

Q. And I hear you and we'll get a chance to take a look at that data at some point, so that is kind of the evolution here that we are trying to talk about here today. I understand your testimony, but I'm asking you, would it be appropriate if Kensu's healthcare professionals multiple times says he needs to have an orthopedic consult, that

**85**

four years after he won a lawsuit over his shoulder, he still hasn't had an orthopedic consult?

MR. LANESKY: Just object to the form of the question.

THE WITNESS: So you are talking in 2020 Mr. Kensu has still not seen an orthopod?

Q. (By Mr. Altman) That's correct, to the best of my knowledge.

MR. LANESKY: He says to the best of his knowledge, so --

THE WITNESS: The best of his knowledge, yeah, because I believe -- I really think, Mr. Altman, out of all due respect, I do think that in 2020 our process is much different from the Corizon than it was when PA McKissick was involved.

Q. (By Mr. Altman) Okay. What --

A. We want our providers to advocate for the patient and appeal an ATP if they don't agree with it or if -- for whatever reason, if they don't agree with that, if the prisoner continues to complain about it, then the need to -- it's on the provider to work with their RMD and to work with me so that we can provide the best care for that individual. So that, I see as a shift from where we were in '16 to where we are now.

I think that much of what makes Corizon responsive is

22 (Pages 82 to 85)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

86

your advocacy and I appreciate that. So we are definitely in a different place than where we were with PA McKissick.

Q. Were you aware that she testified she didn't even know that there was an appeal process?

A. PA McKissick is no longer with the organization.

Q. I just asked --

A. I don't know what her testimony was.

Q. I just asked if you knew that. That's fine.

A. No.

Q. So when did these changes take place?

A. Most of them started taking place in 2018. 2018 into the beginning of 2019.

Q. 2018 into 2019. So would Corizon agree that the mechanism by which a prisoner could get this, let's call it nonstandard or external treatment was not as good before this time than it is today?

MR. LANESKY: I'll just object to the form of the question.

MR. ALTMAN: I'll withdraw it. Never mind.

Q. (By Mr. Altman) Now, when a 407 is submitted to the utilization manager, if information is missing off of the request itself, do they look at the medical records themselves or do they bounce the request?

A. No, what they do is they ask for more information. The reason they don't go into the medical record is that

87

Dr. Stacey and Dr. Dorsey don't have access into COMS and so we want each of the 407s to stand on their own merit. If there is a need for more information and there's a request for more information to be submitted to utilization management.

Q. Now, the healthcare professionals at the sites, are they paid by the hour?

A. Remember, Mr. Altman, I know there's been a shift in their -- they are still paid the same. I think they've gone from being hourly to a salaried position.

Q. When did that happen?

A. 2019.

Q. Were they paid overtime at that point in time if they worked more hours?

A. They were paid, as well, and they are still paid overtime now. There's overtime payment in both models.

Q. So even though they are on a fixed salary now, if they work more than 40 hours a week they get paid extra money?

A. If they work over 40 hours a week then, yes, they would get that overtime.

Q. Now, are the professionals allowed to leave when their shift is over or are they required to stay until all the patients that day have been seen?

A. Well, during COVID, many of them stayed over longer until things were all completed, so --

88

Q. Let's put COVID aside because the whole universe is different, but pre-COVID, were they required to stay until all the patients were seen?

A. It really was -- it would be recommended that they would stay until their schedule was seen, understanding that sometimes there are urgent and emergent patients that are fit in and so sometimes they would adjust their schedule. If there was an emergent patient coming in or urgent issue before they were getting ready to leave, we would encourage them to stay to see that patient.

Q. Now, is it Corizon's position that when unsure of a situation, it's better to err on the side of caution and safety?

A. That would be correct.

Q. Now, the 407 forms, are they maintained, can you sit and look in -- is it CARES, look in CARES and see a 407, the actual 407 form?

A. They are uploaded into CARES, yes.

Q. But are they uploaded as, like, a complete document or is, like, the data of the 407 in separate discrete fields?

A. No, it's a PDF that is posted into CARES.

Q. Is there a separate -- is it maintained as separate data? Like, can you see how many orthopedic consults were requested in a given period of time? Is that information maintained that way?

89

A. We can -- the data is able to be parsed out according to are they cardiology requests, are they radiology requests, are they -- so any of the specialties, yes, we are able to pull up the data with the number of requests.

Q. So the data that makes up the 407 is also maintained within a database separate from the 407 itself which looks like a form that a human can read, correct? Is that a fair statement?

A. So in CARES is a process that you would put the information in as a provider, for the reviewing provider. I can look into CARES, I can put the -- search the patient number or name. It will pull up a list of all the requests that they've had, whether they've been accepted, appealed, pending or completed. So I can pull up a person and look at that. The data that is embedded in that is beyond my capacity to understand. They can get that information from the utilization management department at Corizon to give us the reports that we need to --

Q. Let me ask it a little different and I think we'll get the answer. When you go to do a 407 request --

A. Okay.

Q. -- do you literally type it into the actual form like almost as if you were handwriting on the form, or do you fill out a bunch of fields that asks you a bunch of questions and then it makes the form for you?

23 (Pages 86 to 89)

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

90

A. No, the form is in COMS, so if I was doing a 407, I would select consult and it pulls up a template that you then fill out the template and it's like a Word document, so it has a history and then it will self-populate. If you are in a visit, it will pull the examination in or you can type in the examination, it gives you fields to check box, and then your request.

Q. Got you. Okay. Now, I think I asked earlier and maybe got an answer. The prisoner himself or herself cannot appeal a 407, correct?

A. Correct. The prisoner cannot appeal it directly. They can ask their provider, they can, in discussion with their provider, they can say, I don't agree with this and the provider can submit an appeal on their behalf or the other thing that we didn't talk about is if the patient is not in agreement, they could submit a grievance.

Q. Okay. Which we will come back to in a little bit.
Are there any guidelines as to when the recommendations of a specialist are not going to be adhered to?

A. Would you clarify your question?

Q. So a specialist examines, a 407 is done for a consult with a specialist, a cardiologist. Okay. The cardiologist examines the patient and says I think he needs a stent. Okay. And he recommends that a stent be put in and

91

surgery be scheduled. That is going to go back to utilization manager to approve that surgery, correct?

A. Well, no. What will happen is the patient is seen by the cardiologist. The cardiologist has communications back to the provider to what we call a 409, the form that they fill out. We look for the dictation on the consultation and the recommendations of the consultants. So if it was recommended that a procedure be done by cardiology, the provider would review that and write a new 407 for that procedure and submit it up to utilization management.

Q. That's kind of what I meant. So then it would go up to utilization management at that point?

A. Right.

Q. Under what circumstances would utilization management go against the recommendations of a specialist?

A. So the recommendation of the specialist and utilization management, they are using InterQual criteria. They are using UpToDate. They are using the most current evidence that they have available to look at that. So say it's just one stent in a distal ancillary coronary artery and they may recommend medical management, you know, alternative treatment plan, medical management for this amount of time, reevaluate and resubmit.

Q. Now, what if the specialist specifically addressed that and said, no, he needs it.

92

A. That would -- go ahead. I'm sorry.

Q. I'm not talking about a resubmit. Let's say the specialist has taken all that into account and said very specifically why they need this particular thing. Okay. So you're saying that the utilization management manager can still trump what the specialist says?

A. In that case, yes, and if we don't agree with it, so the provider would use it, says, there's another ATP, another alternate treatment plan. The provider says I know this patient. I know they are a good specialist. I think this patient needs it, then it goes to the RMD, what we call the RMD council, which is all the regional medical directors, myself, we review the case with the provider and then determine to either support what the utilization management says or override what the utilization managment says, so it's another appeal level and so we can do that. If our team says, no, we support what utilization management says and the provider says, I don't agree with you, I agree with the specialist, that then goes to the MDOC level for review and appeal.

Q. Now, you said before a prisoner, if the provider doesn't want to do the appeal, the prisoner can file a grievance, correct?

A. The prisoner can always file a grievance, yes.

Q. And how are those grievances processed with respect to

93

Corizon? How does Corizon find out about such a grievance?

A. Sometimes we don't find out about a grievance unless it goes up to the third level. So if it's a first-level grievance, that's at the level of the facility and the facility takes care of it. Then there's what they call a second-level grievance, where the prisoner is grieving the response that they got from the facility, so there's another level of review and by the time it gets to a third-level grievance, then Corizon is pulled in and we have a third-level grievance, we have to do something with this.

Q. I understand, but let's just take the hypothetical, the patient's got pain, the provider says he needs a consult, goes up, utilization says -- gets sent down an ATP. The provider decides not to appeal. The prisoner is not happy with that so he files a grievance. I imagine Corizon has got to be involved even in the step-one grievance process where they are complaining about the decision of one of its providers, isn't it?

A. If they're complaining about the provider, then Corizon will find out about it. Sometimes the provider is not always listed in a grievance.

Q. Even if the provider isn't listed in the grievance, it still would have to involve the provider, wouldn't it?

24 (Pages 90 to 93)

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

94

MR. LANESKY: I'm a little bit confused, but --

MR. ALTMAN: All right. Let me take a step back. Let me make it not confusing, okay?

Q. (By Mr. Altman) I'm a prisoner. I go and I go see my healthcare professional. They recommend that I go see a rheumatologist. Okay. I might have arthritis. It goes up to the utilization management, says, no, we want to do an ATP. Take Naprosyn, whatever. Try that first. Okay. Goes back down. I don't agree with it as a prisoner. Okay. I think I should be going to see the rheumatologist and I file a grievance that I should be going to see a rheumatologist and that my healthcare professional has said that I should go see a rheumatologist and it got denied. All right. How does that grievance not involve Corizon?

MR. LANESKY: I'm just going to object to the foundation.

Q. (By Mr. Altman) Do you understand my question at this point?

A. No, I understand your question, I'm just trying to, you know, I'm still relatively new in the state medical director role, so I have not had that many -- that experience with receiving the grievances on our providers.

Q. Okay, but if a prisoner specifically grieves about a Corizon employee, Corizon must know about that as part of

95

the process, right?

A. I would think that would come back to Corizon, yes.

Q. Even on a step one, right?

A. There would be communication.

Q. How is that communication maintained?

A. Usually by emails or a phone call.

Q. Okay. Is there a specific process in place that when there is a grievance involving a Corizon employee how Corizon is notified of that grievance?

A. Mr. Altman, I am not aware of a specific process with that.

Q. In your role as state medical director, have you been made aware of grievances made against Corizon employees?

MR. LANESKY: Have you been informed of any grievances for Corizon employees since you've been state medical director?

THE WITNESS: No, I have not.

MR. LANESKY: Was that the question, Keith?

MR. ALTMAN: Yeah.

Q. (By Mr. Altman) So sitting here right now, I mean, I'm asking you personally, you have no idea how a grievance against a Corizon employee is actually processed because you've never seen one?

A. That's correct.

Q. Now, do you know the difference between a grievance and a

96

kite?

A. Yes.

Q. What's Corizon's understanding of the difference?

A. A kite is a request by the prisoner for supplies, a complaint, I need to see healthcare. Basically, those kinds of communication. A kite is a communication from the prisoner to healthcare.

Q. Now, do those kites come to Corizon or to the MDOC?

A. Those are all under the MDOC.

Q. How does Corizon become aware of the nature and topic of a kite?

A. Corizon itself at our level, we don't. At the main level, we don't necessarily know. A provider at the facility level would be able to find out about the kite because they have communication with the nursing team.

Q. And I understand. I'm asking at the facility level, how are kites handled? I'm trying to understand the process of going from a kite, you know, something filled out by a prisoner to the prisoner actually getting to see somebody, which would be a Corizon employee. I'm trying to understand how that process happens.

A. All right. So that's a much more clear question then the one that you had previously asked, so --

Q. I knew I'd get it right eventually.

A. Thank you. So a kite is submitted, it goes in the kite

97

box. The nurses -- the nursing team have rounds to the housing units. They go to the kite box, they pick up the kites, the kites come back to healthcare. There can be one, there can be a dozen, there can be a stack, and the nursing team goes through individually the kites that they have, which could be anywhere from I need my eyedrops to I need to see a provider because I have a hangnail, and the nurses prioritize that, they put the information into the medical record and then there is a process by which they address what the prisoner needs and usually there is a response.

So the kite, most of the time we get it on a kite form, so the top part of the form is handwritten with what the prisoner wants and the bottom part of the form is where the nurse writes what's going on. Often, though, we can type it in and then they get their response. Either they get a call-out or the response goes back to the patient through the prison mail system, you know, back to the housing unit.

Q. Okay. So it's the nurses of the MDOC that decide whether healthcare should see this person?

A. Yes, that's correct.

Q. Okay. Bear with me a second, please. How does Corizon keep track of the cost of care for given prisoners?

25 (Pages 94 to 97)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

98

A. So the question is, how does Corizon keep track of the cost of prisoner care; is that correct?

Q. Yes. I mean, I imagine there's two components to it. There is staff costs which are essentially fixed. You have staff, they get paid.

A. Right.

Q. And then there is whatever costs associated with a particular treatment, whether it's medication, durable medical goods, consults, surgeries, whatever, that's obviously dependent on the particular treatment, correct?

A. Right, that's correct.

Q. Okay. How does Corizon keep track of costs for -- keep track of costs? I don't know if it's done on a prisoner level, on an aggregate level, by the facility, et cetera,

A. There's financials sent to the Corizon office in Brentwood, the support office runs on every single contract. So we have our financials that really actually the VPO, vice president of operations, has financial sheets on everything that goes on. I mean, I know you don't want to talk about COVID, but that's, like, probably the most solid example I have, which is, you know, we had to look at our labor costs with COVID, we had to look at testing costs for COVID, we had to look at her hospitalization costs, we had to look at post-COVID care, so then we would look at, you know, how much did each of

99

those things, you know, in aggregate cost, the contract. So we do keep track of it. It's beyond what I know. I mean, I know that they keep track of it. I just don't know how they do that.

Q. But you're part of the review on an aggregate level of those kinds of costs, correct?

A. I am privileged to see those aggregate costs, yes.

Q. Have you been, and I know you are relatively new tenure, but as the president now, have there been -- strike that. As a general proposition, trying to be efficient with costs, there is nothing wrong with that in healthcare, correct?

A. Right, there's nothing --

Q. It doesn't make you bad doctors because you try to be efficient with how money is spent, correct?

A. Right. That's correct.

Q. It becomes a problem, though, when you start sacrificing efficacy for money. We talked about that earlier, correct?

A. Exactly.

Q. Has Corizon engaged in any cost-cutting strategies, you know, like I said, I say pre-COVID just because there is no playbook. Nobody knows anything, but before COVID hit and I know you just said that, but are you aware of cost-cutting strategies that Corizon had put in place to

100

try to help minimize and manage costs?

A. Right, we do. We are managing costs, but not at the expense of quality care for the patients. They are looking at, you know, the structure of -- at the corporate level right now with our current equity group, you know, the layers of leadership. So there's talk of changes with how the leadership, how many layers of leadership will we have, so they are looking at that.

Q. Are there specific instances of cost-cutting efforts that you are aware of since you have been state medical director?

A. The only thing I can think of, Mr. Altman, would be not replacing some office staff due to attrition, people that have left their position, we are not going to necessarily fill their position, and that's at the office level, it's not -- it's not at all related to the care provided to our patients.

Q. Now, how does Corizon interact with the MDOC in terms of delivery of healthcare?

A. There's communication between myself and the MDOC clinical leadership. So the CMO Carmen McIntyre would be, assistant chief medical officers, Dr. Blessman and Dr. Hussein and PA Buzkirk, so we have -- I have weekly meetings with Dr. Blessman and PA Buskirk and I have twice-weekly meetings with Dr. McIntyre and then we

101

coordinate with health services administrator Marti Kay Sherry to come up with a plan of how we are going to, you know, provide care.

Q. You have these weekly meetings, but how intensive is the interaction between the two? Is Corizon pretty much within the guidelines left to its own devices to deliver the healthcare or is the MDOC watching very closely?

A. Well, I think it's a very collegial relationship at this point, so we provide care under the guidelines that, one, are set by Corizon and also by the MDOC.

Q. When a prisoner sees a specialist, that costs Corizon additional money beyond its staffing costs, correct?

A. There is a cost to see the specialist, yes, that's what we call our offsite spec.

Q. Now, who bears the costs of security that goes along with bringing a prisoner to a specialist?

A. That would be the MDOC's responsibility.

Q. Aside from, you know, the committee between you and Dr. McIntyre and Blessman, the upper-level appeal committee, does the MDOC have any say in the care for an individual patient if there's no complaints?

A. If there's no complaints?

Q. Terrible question. If a prisoner's care is being managed in a way that he's not complaining to anyone, does the MDOC get involved in a particular patient's care?

26 (Pages 98 to 101)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

102

A. Well, the only example I can think of, Mr. Altman, would be with a hunger strike. They take the lead on that in terms of monitoring and things. The providers at Corizon, the providers are involved with it in terms of the direction of what's going to happen to someone who's on a hunger strike, the MDOC takes the lead on that one.

Q. Okay. But aside from that, normal routine care of and routine sicknesses of patients and putting COVID aside for a minute, does the MDOC make any of the decisions with respect to a patient's care?

A. Not typically.

Q. That would only come about if it gets appealed all the way up the chain and then Dr. McIntyre and Blessman may get involved, correct?

A. Right. If there is a concern, then, yes, they would get involved with that.

Q. Short of that, Corizon is left to its own devices for managing the care?

A. Well, I wouldn't say it's our own devices. I mean, we follow standard of care, community standards of evidence-based medicine.

Q. Understood, but I mean, unless there is a complaint, the MDOC is not involved in an individual patient's care?

A. The MDOC does not micromanage, if that's the question you're asking.

103

Q. That's a better way to put it, but that's what I was asking.

A. Thank you.

Q. Now, Corizon would agree that bureaucracy does not get in the way of a patient receiving necessary care, correct?

A. Would you be able to define "bureaucracy" for me?

Q. You know, policies, procedures and everything like that and paperwork and approvals and all that kind of stuff, none of that should get in the way of a patient receiving the care that they need, correct?

A. I think on a hypothetical, you are correct, Mr. Altman.

Q. When you say hypothetically, when would it be okay for bureaucracy to get in the way of getting care?

A. Well, it can get in the way of care. It's just kind of the way we are in corrections. There is a lot of layers sometimes.

Q. I understand that it can, but it's not supposed to, right?

A. In an ideal world, it's not supposed to.

Q. And cost should not get in the way of a prisoner receiving the care that they need, correct, we talked about that before?

A. In an ideal world, you are correct.

Q. Well, even in an un-ideal world, cost is not supposed to be the issue, correct, for them to get the care they need?

A. Absolutely.

104

Q. The only dispute comes in, do they need a particular course of treatment, that's maybe subject to debate, but if they need it, they are supposed to get it, right?

A. That's correct.

Q. Money is not the issue there, correct?

A. Correct.

Mr. Altman, can I take a break for five minutes?

Q. Of course you may. Come back when you're ready. No problem.

A. Thank you very much.

Q. You're welcome.

(Brief recess.)

Q. (By Mr. Altman) How does Corizon assess the performance of its healthcare professionals?

A. So we have a performance review process that we review charts, so random selection of 10 charts. At the annual meeting, we do mid-level reviews on a monthly basis, so we look at that. The RMD is encouraged to go out to the facilities. Now, that was pre-COVID, usually monthly, to review what was going on with the providers and then we take into account any communication that we have from the MDOC regarding concerns or accolades on the provider.

Q. Now, I'm using the word complaint. There's three different uses of the word complaint that we could talk about. There is the complaint like a prisoner doesn't

105

feel well, that's a complaint.

A. Right --

Q. There's a complaint like a lawsuit.

A. Right.

Q. We are not talking about that. And then there is a complaint which is more of an internal, I'm not getting the healthcare that I need, so I guess more of a grievance.

A. Right.

Q. How many complaints, and I am talking about, like, I didn't get what I was supposed to get, does Corizon receive on a whatever metric basis you are comfortable with, monthly, annually?

A. So if I'm looking on a monthly basis, we will get complaints of that sort from different sources, either, you know, advocates for the prisoner, family members, that source. There is anywhere from 5 to 10 a month.

Q. First of all, were do they come to?

A. They'll come through an email usually, then it will go to risk management. Our risk management sends it to the MDOC, to Kelly Malle who handles complaints at the MDOC level and then if there is a concern that there may be -- that it may be related to a lawsuit, then it goes to the legal department at the Corizon Brentwood office.

Q. Okay. Now how are they processed internally within

27 (Pages 102 to 105)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

106

Corizon? How does Corizon deal with it?

A. So the risk manager looks at it, reads it, will craft a response to Kelly Malle, send a standard response to the initiating person, then it's reviewed internally in the legal department at Corizon and then sometimes Chapman Law is brought into it.

Q. No, I'm not looking at it from how do you deal with it from a legal basis. How do you deal with it from a quality of care perspective? If somebody calls up and says, you know, I didn't get this treatment, I didn't get that treatment, whatever it is, I'm looking at it from a quality of care perspective.

A. Oh, from quality management, okay. So in that perspective, then the risk management's nurse, the case manager for that will also do a chart review and look for what's in the chart related to the complaint, they'll bring that to me and then we'll review with the RMD and the provider.

Q. So are you involved in every one of these 5 to 10 per month complaints?

A. Peripherally, yes, and sometimes a little bit more deeply on some of the others.

Q. Like a Kensu-type situation?

A. Yeah, like a Kensu kind of situation, I probably am involved deeply, just like I am now.

107

Q. Now, he is the class rep in this case and you do have -- I mean, not only do you have knowledge from a supervisor's perspective, you treated him for a while. Corizon would agree that if he hasn't seen an orthopedist after all this time, and let's spot credit for COVID, okay, that things may have been difficult, but let's just say through the end of 2019, okay, Kensu should have seen an orthopedist long before that, shouldn't he?

MR. LANESKY: I'll just object to the form and the foundation.

THE WITNESS: Yes.

Q. (By Mr. Altman) Does Corizon have any explanation as to why he didn't see an orthopedist through the end of 2019?

MR. LANESKY: Same objections, form and foundation.

THE WITNESS: I don't have an answer for that, Mr. Altman.

Q. (By Mr. Altman) I know that you review Kensu's -- the management of his care, looking at the details, but has anybody at Corizon done a review as to why Kensu has not received, you know, has not seen an orthopedist after all that time?

A. No, we haven't.

Q. Corizon would agree this particular thing with Kensu, it's not the way things are supposed to work, right?

MR. LANESKY: Again, just object to the form of the

108

question.

THE WITNESS: So in regards to Mr. Kensu, the question you're asking is it should not have taken so many years for him to see an orthopedist. Is that correct?

Q. (By Mr. Altman) Right, yes, and my follow-up was that's just not the way the process is supposed to work, is it?

A. That's correct. It would be -- yes, you're right.

Q. Are there other prisoners within the MDOC that have similar -- have had similar problems receiving care?

MR. LANESKY: I'm just going to object to the foundation. It's kind of vague, but go ahead.

Q. (By Mr. Altman) All right. Let's take a step back. I mean, Kensu has a complex medical history, agreed? There's no dispute over that?

A. Agreed. No dispute over that. Are there others in the MDOC that may have languished in the wings for getting certain things? Yes, I'm certain there are probably prisoners that have not gotten things timely.

Q. Has Corizon done anything to fix that problem or try to fix that problem?

A. Oh, absolutely. I think what we initiated under Dr. Bomber especially the end '18 into '19 is really to educate providers to advocate for the patient and if they disagree with an ATP, that they need to appeal it and the whole appeal process with the layers of being able to even

109

reach the MDOC for an appeal for a partner override is more evident than ever before, so I do think that what you brought forward with Mr. Kensu has actually improved our organization.

Q. Well, I would love to take the credit for that, but he's really the one that's, you know, that has taken things up. I'm just the vehicle. Bear with me a sec.

I have to ask some specific stuff for foundation. So before you came into the correctional medicine, you treated patients outside, correct?

A. That's correct.

Q. Did you ever suggest a patient use nonpharmacologic treatment, supportive care, et cetera, for various types of things they may have been suffering?

A. Absolutely. I'm an osteopath, so I would do osteopathic manual medicine.

Q. Okay, but aside from that, I mean, like, for example, heating pads. Do heating pads help some people to relieve pain?

A. Well, a heating pad is supportive, but you don't want to use it longer than about 10 or 15 minutes, so --

Q. Okay.

A. Otherwise, it will not be effective. Yeah, you can recommend that.

Q. Have you recommended that people use heating pads

28 (Pages 106 to 109)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

---

**110**

intermittently to help them deal with pain?

A. Yes.

Q. And if somebody said I used a heating pad and it appeared to give me some relief, would you believe them when they told you that?

A. Yes.

Q. So, you know, it wouldn't be fair to characterize a heating pad as snake oil, right?

A. I don't think so.

Q. Now, of course, there are extreme risks of using a heating pad, but as a general proposition, while it may cease to become effective if you use it for too long, it's probably not going to hurt you, right?

A. Well, they've made adjustments to heating pads so they won't hurt people, but right. I mean, you get more expectation the longer you use it.

Q. And that's part of the calculus, isn't it, when you suggest that someone use a pad, that if the risk of harm is low, then there's more tolerance trying of something that they -- well, strike that. Do you know of any double-blind randomized placebo-controlled trials showing whether heating pads work and for how long?

A. I'm not familiar with those studies, Mr. Altman.

Q. So your use of a heating pad is based on anecdotal, you

---

**111**

know, anecdotal experience, correct?

A. I think anecdotal and there was probably recommendations when I was a medical student.

Q. Understood, but my point is, is that doctors will sometimes recommend things for which there is not the same level of evidence as if we were going to prescribe a chemotherapy drug, right?

A. Right.

Q. And more the risks of using a treatment are, the more sure you are going to want to be of the efficacy and potentially the safety of the treatment, right?

A. Correct.

Q. So if a prisoner believed that a heating pad would provide them some relief from pain, can Corizon think of some fundamental reason why they should not have a heating pad?

A. Right. There's not always electric in the cells. It can be used as contraband. There's a number of things that we have to consider on the outside of the --

Q. From a medical perspective.

A. From a medical perspective, it would make sense to be able to recommend it. That being said, in the environment of corrections, there is another layer that is added to the decision-making process.

Q. Understood, but from a medical perspective, it's not an issue. I understand security, somebody could use a, you

---

**112**

know, the cord to strangle somebody and something like that, right? But if, for example, there were outlets in the cell, that's not a limitation, right?

A. If there is outlets in the cell it's not a limitation, but more than likely it's because there's a cord on it.

Q. But if there are other devices that prisoners are allowed to have that have cords, there's no particular difference between a heating pad with the cord and a television with the cord, right?

MR. LANESKY: I'm just going to object to the foundation now. Go ahead.

THE WITNESS: I don't feel like I have the ability to really answer that question for you, Mr. Altman.

Q. (By Mr. Altman) Okay. That's totally fine. What about a hot water bottle? Any particular reason that if a hot water bottle would provide some relief to a prisoner, that they should have one?

MR. LANESKY: I'm just going to object to form and the foundation of the question, you know. I think it's outside of the scope of the questions that were put forth.

MR. ALTMAN: Okay. Noted.

Q. (By Mr. Altman) You can answer.

A. All right. So there was a point in time in the MDOC where hot water bottles were used for symptomatic treatment. Unfortunately, what we found is that people began to use

---

**113**

them for not the purpose that they were prescribed.

Q. Okay. So that's a nonmedical reason, though?

A. That would be a nonmedical reason related to custody and concern for safety of the inmates.

Q. Okay. Fair enough. What about like those Dr. Scholl's gel inserts that you can get for your shoes, if they would provide some relief to a prisoner, is that something a prisoner ought to be able to have?

MR. LANESKY: Object to the foundation.

THE WITNESS: Again, Mr. Altman, those were available to individuals and they were not used appropriately. They were actually thrown into microwaves, heated up and thrown at other prisoners to cause bodily harm.

Q. (By Mr. Altman) Understood. I'm only asking medically. I'm not asking that there might not be another reason why, but from a medical perspective, there's not a medical reason, right?

A. Right. From a medical perspective, it would be wonderful that patients would be able to purchase insoles to give them relief.

Q. Now, Corizon would agree that it is important to treat pain whenever reasonably possible, correct?

A. Yes.

Q. And that if somebody had migraines, it would be, you know, if you didn't give them a specific migraine medication,

---

29 (Pages 110 to 113)

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

114

but certainly to provide them, let's say, Motrin or Advil or something like that, that would be a reasonable thing to do, correct?

A. Correct.

Q. And if it provided relief to the prisoner, that's something that should be continued absent any specific evidence of abuse or anything, correct?

A. Correct.

Q. And I'm not sure if I asked this, but is Tylenol restricted in the MDOC?

A. The number of pills are that they are able to possess is limited.

Q. To how many? Do you know?

A. 30 a month.

Q. 30 a month. If you took 30 pills of Tylenol in one shot, you would be in big trouble, wouldn't you?

A. Yes.

Q. Do you know what the number one drug used to commit suicide in the United States is?

A. Tylenol.

Q. And aside from 30 pills, I mean, 30 pills is more than enough to probably kill yourself if you took them all in one shot, right?

A. Well, if it didn't kill you, it would definitely kill your liver.

115

Q. You'd probably wish you were dead.

And aside from 30 pills, Tylenol is not restricted, correct?

A. No, it's not restricted.

Q. If a Corizon doctor prescribes a specific diet or dietary modification, is that supposed to be abided by by the MDOC?

A. Actually, there is a new process, Mr. Altman, in terms of dietary diets. With the new medical record we have, the diets are very limited and the provider must review with a dietitian as to the special diet that would be needed for the prisoner.

Q. Okay. So I'm not sure I understand how that changes anything.

A. So the provider is no longer able to write a special diet. So it has to be one of the special diets you can pick, one of the special diets that's in the medical record with consultation from dietary.

Q. So how is a dispute between dietary and the provider resolved? Do you understand my question? If the provider says, this patient needs this specific diet and the dietitian says no, then what happens?

A. Well, right now, it would have to go to PA Buskirk to be reviewed because he is the lead on that from the MDOC.

Q. On the diets, you mean?

116

A. Yes, on the diets. So if there was a disagreement between the provider and the dietary, then the provider could take it up to PA Buskirk to review.

Q. So does a prisoner not get the diet if there's a dispute or they do get the diet and it's the dietitian that has raised the dispute?

A. They're not going to get the diet until it's determined at the MDOC level for the patient now --

Q. Now, what if --

A. -- which is different from what it was.

Q. Okay. I'm sorry. Now, what if there is a patient that needs dietary support that's not one of the standard diets, then what happens?

A. That's a decision at the MDOC level and they have to determine what's going to happen. They have to figure out how it's going to work into the facility.

Q. When did this change take place, do you know?

A. Yeah, it just took place this year, January 2020. With the rollout of the new health record COMS, the new dietary protocol rolled out.

Q. And you said there were far fewer dietary -- diet choices then there were?

A. There's more specific dietary, so we cannot individualize specific diets for each and every prisoner that needs a special diet. There probably was -- I'm trying to

117

remember the statistics, so bear with me, I don't want to misrepresent. I know that at one point they had to take over it was probably close to 100, maybe a little over, maybe a little under, 100 different diets in the MDOC and bring them down to about 25 choices, specific choices for snack bags and diets, so it's been a pretty big change over the last, you know, six or seven months with diets.

Q. I imagine that there are certain very specialized diets that don't fall under that, like somebody with PKU or something like that, that just needs a totally radically different way to eat?

A. I would think so, but I don't have that answer for you.

Q. But you would agree that -- if there's a dispute between PA Buskirk and the provider, how does it get resolved?

A. That would go up to Dr. McIntyre.

Q. So that goes through kind of the normal appeal, the normal appeal channel?

A. Yes, sir.

MR. ALTMAN: Let's take like a 10-minute break. I don't have too much longer, but let me get my thoughts together. So we'll take a break and figure out where we stand. Thank you.

(Brief recess.)

Q. (By Mr. Altman) I asked you a bit about macular degeneration a little bit earlier. I just want to try to

30 (Pages 114 to 117)

American Reporting, Inc.
248-559-6750

Patricia Ann Schmidt, D.O.                    Temujin Kensu v. Corizon, Inc.

118

understand something.  Have you heard of Eylea or Lucentis, those two drugs?

A.  I haven't been following with macular degeneration, Mr. Altman.  I apologize.

Q.  All right.  Those two drugs are approved for macular degeneration, diabetic retinopathy and stuff like that and there's also Avastin, which is also used to treat that. It costs one-fortieth of what Eylea or Lucentis costs.  It is not -- it is an off-label indication, but there's clinical evidence of efficacy.  Would Corizon allow such a use when even though it's off-label there is clinical evidence of efficacy?

A.  I would have to review the documentation, Mr. Altman.  I can't answer that question.

Q.  I'm using that as an example, but I'm not asking specifically about Avastin versus these things.  It's the concept of you have something there that is shown to be just as effective as the on-label ones being used off-label.  In that context, is off-label usage okay?

A.  Okay.  I think I understand your question.  You're asking if there's strong evidence that is not necessarily documented by a study for off-label use, but anecdotally over a period of time in a number of patient cases, would we use something that now has indication for use. Speaking from the perspective of Corizon and our really

119

strong point on quality of patient care and evidence, I would have to say that most likely we would, unless there is a real strong -- there's some other strong evidence given by our clinical pharmacy team to not be able to use it, so --

MR. ALTMAN:  I think I will pass the witness at this time.

MR. LANESKY:  I have no further -- I have no questions at this point in time, Keith.  I mean, if you want to continue on --

MR. ALTMAN:  How could you have further questions, you didn't ask any?

MR. LANESKY:  Well, I could sit here and do her whole deposition over, but I feel pretty confident.

MR. ALTMAN:  Okay.  Dr. Schmidt, thank you for your time.

(Whereupon the deposition was concluded at about 2:45 p.m.)

120

CERTIFICATE OF NOTARY - COURT RECORDER

STATE OF MICHIGAN)
                 )
COUNTY OF OAKLAND)

I, James A. Hengstebeck, a Notary Public in and for the above county and state, do hereby certify that the deposition of PATRICIA ANN SCHMIDT, D.O. remotely appeared before me at the time hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me; that it was later reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.

I further certify that I am neither of counsel to either party nor interested in the event of this case.

_____
James A. Hengstebeck, CER 4623,
Notary Public, Oakland County,
Michigan
My Commission Expires:  10-30-2022

American Reporting, Inc.
248-559-6750